[No. A029065. First Dist., Div. Two. Oct. 21, 1986.]

KEITH KING, JR., a Minor, etc., et al., Plaintiffs and Respondents, v.
LINDA McMAHON, as Director, etc., et al.,
Defendants and Appellants.

**COUNSEL**

John K. Van de Kamp, Attorney General, and Stephanie Wald, Deputy Attorney General, for Defendants and Appellants.

Phyllis E. Andelin, Elizabeth R. Arnold and Tricia Berke Vinson for Plaintiffs and Respondents.

**OPINION**

**KLINE, P. J.**—The California Department of Social Services (Department) appeals the grant of summary judgment enjoining the denial of state foster care benefits to foster children living with relatives, while granting benefits to foster children living with nonrelatives. The court below held that the denial of such benefits deprived plaintiff children of the equal protection of the laws in violation of article I, section 7, subdivision (a), of the California Constitution.

 Applying strict scrutiny to the challenged classification, the court determined it was unnecessary to further a compelling state interest. For reasons presently set forth, we determine that strict judicial scrutiny is unwarranted because the classification at issue neither designates a suspect class nor impinges upon a fundamental interest. Further, we find that the classification is rationally calculated to achieve a legitimate state

purpose. Consequently, we conclude that the challenged program comports with the requirements of equal protection.

## STATEMENT OF THE CASE

Plaintiffs-respondents are children placed in foster care with relatives and denied certain financial benefits by the state, and their related foster parents. In October 1981, plaintiffs, for themselves and on behalf of others similarly situated, sued the Department through its director in his official capacity.[1] On May 17, 1984, plaintiffs moved for a peremptory writ and partial summary judgment. On August 14, 1984, the trial court issued its statement of decision finding the state foster care program invalid insofar as it excluded from eligibility foster children placed with related foster parents. On September 4, 1984, the court granted plaintiffs' motion for peremptory writ and partial summary judgment. A timely appeal by the Department followed.

### I.

The foster care program is part of the program of aid to families with dependent children (AFDC)[2] authorized in 42 United States Code section 601 et seq.[3]

---

[1]During the pendency of this action Linda McMahon has replaced Marion J. Woods as director of the Department.

[2]For convenience we list the principal abbreviations used in this opinion:
1. AFDC stands for aid to families with dependent children.
2. AFDC-FC refers to the AFDC foster care program.
3. AFDC-FG refers to the AFDC family group program.
4. MPP stands for the Manual of Policies and Procedures of the Department of Social Services. Department regulations and procedures on AFDC and AFDC-FC are contained in this manual.

[3]AFDC is a public assistance program aimed at the "dependent child," that is, a child who has been deprived of parental support or care by reason of the death, continued absence from the home or mental or physical incapacity of a parent. (42 U.S.C. § 606(a).) (Children denied support or care due to the unemployment of a parent may be granted benefits for a limited period of time under the AFDC-U (unemployed) program. Welf. & Inst. Code, § 11201, which is not at issue here.) Once it has been established that a child is "dependent," eligibility for AFDC is determined by various criteria including the monetary resources available to the child. (42 U.S.C. § 602; Welf. & Inst. Code, §§ 11200 et seq., 11450.)

Financed primarily by the federal government, AFDC is administered by the states on an elective basis. States participating in the program are required to submit a plan for approval to the federal government, which plan must conform to the Social Security Act and to federal rules and regulations. (*King* v. *Smith* (1968) 392 U.S. 309, 316-317 [20 L.Ed.2d 1118, 1125-1126, 88 S.Ct. 2128].)

California has so elected. Its AFDC provisions, including requirements for eligibility, are contained in section 11200 et seq., of the Welfare and Institutions Code.

The basic AFDC assistance program is AFDC-FG. Fifty percent of the funds for this program are provided by the federal government.

For a family with dependent children to qualify for AFDC-FG, children must not only be deprived of parental support and care but must be "needy." States are required to set a

The purpose of the AFDC program is to encourage the care of dependent children in their own homes or in the homes of relatives. (42 U.S.C. § 601.) AFDC-FC payments are greater than basic AFDC, upon a recognition that foster children have greater needs and foster care is more costly than care for children in the parental home. (See *Ramos v. Montgomery* (S.D.Cal. 1970) 313 F.Supp. 1179, 1181-1182, affd., 400 U.S. 1003 [27 L.Ed.2d 618, 91 S.Ct. 572].)

California's program for foster care benefits is really two programs: one involving the use of federal funds, the other financed by the state alone. The state defines foster care as "24-hour out-of-home care provided to children whose own families are unable or unwilling to care for them, and who are in need of temporary or long-term substitute parenting." (Welf. & Inst. Code, § 11400, subd. (e).)

The first of the two foster care programs is the joint federal-state foster care program ("federal program"), partially funded by the federal government and administered by the state.[4] To be eligible for foster care benefits under the federal program the child must have been receiving or eligible for AFDC-FG (family group) or AFDC-U (unemployment) prior to foster care placement. (42 U.S.C. § 672.) In addition, basic eligibility requirements under the federal program mandate that (1) the child be removed from the home of parent or guardian by a judicial determination that con-

---

statewide standard of basic adequate care to be used in determining the need of applicants for AFDC and the amount of the assistance payment. (45 C.F.R. § 233.20(a)(2)(i); Welf. & Inst. Code, § 11452.) To be financially eligible for AFDC-FG a family's gross income must be less than 185 percent of this minimum standard. (MPP 44-207.2.) Once eligible, recipients are given a flat cash grant, less specified income, which is based on the number of people in the family budget unit (FBU). (MPP 44-101 et seq.; Welf. & Inst. Code, § 11450.)

The minimum basic standard is calculated to insure that a family receives safe and healthful housing; minimum clothing needs; adequate food; utilities; education; recreation; personal needs; insurance and medical and dental care not otherwise provided. However, as noted by the California Supreme Court in *County of Alameda v. Carleson* (1971) 5 Cal.3d 730 [97 Cal.Rptr. 385, 488 P.2d 953], these standards are "'*minimum* basic standards of adequate care'" and "not necessarily reflective of actual need." (*Id.*, at p. 742, fn. 14; see also Welf. & Inst. Code, § 11452; *California Welfare Rights Organization v. Carleson* (1971) 4 Cal.3d 445, 448-452 [93 Cal.Rptr. 758, 482 P.2d 670]; *Vaessen v. Woods* (1984) 35 Cal.3d 749, 752-753 [200 Cal.Rptr. 893, 677 P.2d 1183].)

Finally, to be eligible for AFDC-FG, a child must reside with certain enumerated caretaker adult relatives. (42 U.S.C. § 606 (a)(1); MPP, 44-203.2.)

In addition to the cash grant for basic needs, all AFDC-FG recipients are entitled to medical care under the Medi-Cal program and food stamps, if a household is in extreme need. (Welf. & Inst. Code, § 14005.1, MPP, 44-213; 7 U.S.C. § 2014.)

All of the named plaintiffs and identified class members receive AFDC-FG for the care of their related foster children.

[4]Fifty percent of the funds for the federal program come from the federal government, 47.5 percent from the state and 2.5 percent from counties.

tinuation in the home would be contrary to the welfare of the child; (2) the placement and care of the child is the responsibility of the state or county welfare agency and (3) the child is in a foster home or institution as a result of the judicial determination. (42 U.S.C. § 672; MPP 45-202.) The federal program, which prescribes payment to relatives equal to that received by nonrelatives, is not at issue here.

For foster children who do not meet federal criteria, California has its own foster care program funded entirely by the state.[5] To be eligible under the *state* program, the child must meet all general AFDC requirements (Welf. & Inst. Code, § 11250) plus one of the following criteria: (1) the child has been properly relinquished for adoption or a petition to terminate parental rights has been granted; or (2) the child is living with a nonrelated legal guardian in an approved home; or (3) the child was placed with a nonrelative by a court order or under certain written voluntary agreements. Pursuant to the state statute challenged in this case, the child is ineligible for state benefits if placed with foster parents to whom he or she is related.[6] (Welf. & Inst. Code, § 11402, subd. (a), see also, Welf. & Inst. Code, §§ 11401, subd. (b)(3); 11402, subds. (b) and (d); 11405; MPP 45-203.21.) The state program allows foster care payments to a child placed with relatives only if the child is otherwise eligible to receive payments under the federal program. (Welf. & Inst. Code, § 11402, subd. (a).)

State foster care eligibility provisions are much broader than those of the federal program. In other words, despite the denial of benefits to foster children living with relatives, many categories of recipients that would not be covered under any other AFDC program are covered under state AFDC-FC.[7]

---

[5]The state foster care program is described in detail in appellants' MPP. Ninety-five percent of funds for this program are provided by the state, 5 percent by the county.

[6]A relative is defined to include: "(A) The father, mother, brother, sister, half-brother, half-sister, uncle, aunt, first cousin, nephew, niece, or any such person of a preceding generation denoted by the prefixes grand-, great-, or great-great-. [¶] (B) The stepfather, stepmother, stepbrother or stepsister. [¶] (C) The spouse of any person named in (A) or (B) above even after the marriage has been terminated by death or dissolution." (MPP 45-101(hh); Welf. & Inst. Code, § 11400, subd. (k).)

[7]For example, the federal AFDC-FG program does not cover children living with unrelated individuals. The federal AFDC-FC program does not cover children living with unrelated legal guardians or children removed from their parents by means other than a judicial determination. (42 U.S.C. § 672, MPP 45-202.62.) This gap is filled by state AFDC-FC, which does provide benefits to children living with unrelated legal guardians or children removed from their homes because they are awaiting adoption or because their parents have voluntarily agreed to have the child removed. (Welf. & Inst. Code, § 11401.)

Unlike their related counterparts who are fully covered under the AFDC-FG program, these children, unrelated to their foster parents, would have no aid coverage under any of the federal or state AFDC programs but for the state foster care program. (MPP 44-203.2.)

Finally, state AFDC-FC does not require AFDC-FG eligibility prior to placement and does

## II.

The decision of the federal district court in *Youakim* v. *Miller* (N.D.Ill. 1974) 374 F.Supp. 1204, reversed and remanded, 425 U.S. 231 [47 L.Ed.2d 701, 96 S.Ct. 1399] and the related decision of the United States Supreme Court in *Miller* v. *Youakim* (1979) 440 U.S. 125 [59 L.Ed.2d 194, 99 S.Ct. 957] are pertinent to our analysis and warrant brief description at the outset. The plaintiffs in *Youakim* v. *Miller, supra,* 374 F.Supp. 1204, challenged an Illinois statute denying foster care benefits to children living with related foster parents and, as here, claimed a denial of equal protection of the laws. A three judge district court found no equal protection violation as it determined that the statutory classification was subject to the rational basis test and was rationally related to the overall purpose of Illinois' child welfare legislation. (*Id.,* at pp. 1208-1210.) While this decision was being appealed, the United States Department of Health, Education, and Welfare (HEW) issued an interpretation of the federal AFDC-FC statutes to the effect that children cared for by related foster parents were meant to be treated no differently from children whose foster parents were unrelated. In light of that administrative interpretation, the United States Supreme Court remanded the case to the district court to consider whether the Illinois statute was inconsistent with the Social Security Act. (See *Miller* v. *Youakim, supra,* 440 U.S. 125, 132 [59 L.Ed.2d 194, 201].) When the case eventually returned to the Supreme Court it held the Illinois statute inconsistent with the federal standards for AFDC-FC eligibility set forth in the Social Security Act and the HEW regulations interpreting that act. (*Id.,* at p. 135 [59 L.Ed.2d at pp. 202-203].) Due to resolution of the case on this statutory basis it was unnecessary for the Supreme Court to address the equal protection issue.

After the decision in *Miller* v. *Youakim,* the California Department of Social Services concluded that the state must extend benefits to children living with relatives if the children were eligible for federal foster care benefits but that state benefits could be denied if the children did not meet the federal eligibility criteria.

By classifying foster children living with relatives as ineligible under the wholly state-financed program (Welf. & Inst. Code, § 11402), the California Legislature has mandated the different treatment challenged in this action. In challenging this classification plaintiffs claim that the denial of state benefits to foster children living with relatives is neither necessary to serve

---

not provide benefits to children living with relatives, the provision at issue here. (Welf. & Inst. Code, § 11401.)

a compelling state interest nor rationally based, and thus denies them equal protection of the laws.

## III.

■ "The guarantees of equal protection embodied in the Fourteenth Amendment of the United States Constitution and article I, section 7 of the California Constitution 'compel[] recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' (*Purdy & Fitzpatrick* v. *State of Calif.* (1969) 71 Cal.2d 566, 578 . . .; *Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 . . . .) 'This principle, of course, does not preclude the state from drawing any distinctions between different groups of individuals, but does require that, at a minimum, classifications which are created bear a rational relationship to a legitimate public purpose.' (*In re King* (1971) 3 Cal.3d 226, 232 . . . .) However, this deferential standard is inapplicable '"in cases involving 'suspect classifications' or touching on 'fundamental interests' . . . ."' (*Ibid.*) In such cases, 'the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that distinctions drawn by the law are *necessary* to further its purpose.' (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 . . . .)" (*Darces* v. *Woods* (1984) 35 Cal.3d 871, 885 [201 Cal.Rptr. 807, 679 P.2d 458], italics in original.)

As described by the California Supreme Court in *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765 [87 Cal.Rptr. 839, 471 P.2d 487], the rational basis test has been applied by the United States Supreme Court in the area of economic and social welfare regulation where "the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.]" (*Id.*, at p. 784, see, *Dandridge* v. *Williams* (1970) 397 U.S. 471 [25 L.Ed.2d 491, 90 S.Ct. 1153]; *Jefferson* v. *Hackney* (1972) 406 U.S. 535 [32 L.Ed.2d 285, 92 S.Ct. 1724].)

■ Recognizing the independent vitality of the California Constitution, the courts of this state traditionally extend strict scrutiny to a broader range of classifications than are so rigorously reviewed under identical provisions of the federal constitution. (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 261 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929].) Thus, a few classifications not considered suspect under the United States Constitution have been termed invidious or suspect under parallel provisions of our state constitution. (See, e.g., *Darces* v. *Woods, supra,* 35 Cal.3d 871 [AFDC-eligible children who live with un-

documented siblings]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351] [gender].) Also, California views as "fundamental" rights not so viewed under the federal Constitution. (E.g., *Serrano* v. *Priest, supra,* 18 Cal.3d 728, 766 fn. 45 [education when combined with discrimination based on wealth]; *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219] [privacy]; *Long Beach City Employees Assn.* v. *City of Long Beach* (1986) 41 Cal.3d 937 [227 Cal.Rptr. 90, 719 P.2d 660] [privacy].)

## A.

The claim that the classification challenged in this case must be subjected to strict scrutiny relies heavily on *Darces* v. *Woods, supra,* 35 Cal.3d 871. In that case, the Department of Social Services refused to take into account the needs of undocumented alien children of a recipient of AFDC benefits in reducing the grant she received for the benefit of her eligible, citizen children by the amount of her "available" income. The Supreme Court held that the Department's practice violated the equal protection clause of the state Constitution. Application of strict scrutiny was warranted, the court held, because the classifying trait "is one over which the children have no control; the undocumented status of a family member who in coming to this country, albeit illegally, placed the children in their disadvantaged position." (*Id.,* at p. 891.) Applying this reasoning to the instant case, plaintiffs argue, and the trial court found, that the lack of control over the circumstances of their birth (or the "accident of birth") renders foster children placed with relatives a discrete minority and the classification suspect. We cannot agree.

*Darces,* although advocating a more flexible approach to equal protection analysis, nevertheless took pains to connect the classification with more traditional indicia of a suspect class—national origin and ancestry. According to the court: "We have thus far emphasized the *reason* appellant's children constitute a discrete minority—their inability to control their parents' conduct. Equally crucial to our holding is the *fact* that appellant's citizen children are classified on the basis of an immutable trait—they cannot forsake their birth into an undocumented family. They are 'saddled with [the same] disabilities [and] subjected to [the same] history of purposeful unequal treatment' as their brothers and mother. (*San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1, 28 . . . .) Indeed, the challenged classification touches upon two traits that have been historically disfavored— national origin and ancestry. (See, e.g., *Hernandez* v. *Texas* (1954) 347 U.S. 475 . . . [national origin]; *Takahashi* v. *Fish Game Comm'n.* (1948) 334 U.S. 410 . . . [origin and ancestry]; *Oyama* v. *California* (1948) 332

U.S. 633 . . . [same]; *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 . . . [race, alienage, national origin].) As in these lineage cases, appellant's children are classified on the basis of an immutable trait and are relegated to an inferior status into which they are locked by accident of birth. For all of the foregoing reasons, the classification in the present case must be strictly scrutinized." (*Id.,* at p. 893, fn. omitted, italics in original.)

 The classification here at issue does not touch upon any similar immutable trait. Plaintiffs do not suggest that the classification falls with disproportionate impact upon children of a particular race, ancestry or national origin. Nor can application of strict scrutiny be justified on the ground that prejudice against children placed or most likely to be placed in foster care with relatives "tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities . . . ." (*U.S.* v. *Carolene Products Co.* (1938) 304 U.S. 144, 153, fn. 4 [82 L.Ed. 1234, 1242, 58 S.Ct. 778].) Moreover, it is difficult to imagine any children who have control over the actions of their parents or the circumstances of their birth.[8] Adoption of plaintiffs' analysis would require courts to treat as a suspect class any group of children treated differently by government from any other group of children though the two groups are indistinguishable on the basis of all criteria traditionally used to determine whether a classification is suspect. Such a result is manifestly untenable. (See Tribe, American Constitutional Law (2d ed.) § 16-29, pp. 1077-1082.)

*B.*

A more difficult contention is raised by plaintiffs' additional assertion, also concurred in by the trial court, that by refusing to pay foster care benefits to children living with related foster parents, the state has impinged upon the "fundamental interest of the children to live with the members of their extended family."

The cases cited by the trial court and relied upon by plaintiffs, which we shall briefly assay, do not seem to us to support this contention. None of

---

[8]Specifically addressing the question "Does the powerlessness of children justify judicial activism on their behalf?", a noted legal scholar strongly sympathetic to the rights of children concedes that "[b]ecause children do not appear to be subject to the prejudice which plagued the religious and racial groups singled out for attentions in Justice Stone's footnote [in *U.S.* v. *Carolene Products,* cited above], the courts will have difficulty determining that the political system is systematically malfunctioning unless they examine the substantive merits of a particular law affecting children." (Mnookin, In the Interest of Children (1985) pp. 37, 41.) The particular law with which we are here concerned does not give less favored treatment to children, but makes a distinction between two groups of foster children indistinguishable in all respects save the nature of their placement. Though the justification for this distinction in the law may certainly be debated, it clearly is not the result of political bias or other prejudice which courts must be particularly careful to guard against.

these cases identify a fundamental interest of the sort claimed here in the context of an equal protection challenge. The fundamental interest identified in *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187] was education. (*Id.,* at p. 604.) *Waits* v. *Swoap* (1974) 11 Cal.3d 887 [115 Cal.Rptr. 21, 524 P.2d 117], invalidated a Department of Social Services regulation authorizing deductions from the basic AFDC grant to recipients sharing housing with "nonneedy" relatives, on the ground that the regulation was incompatible with the governing statutes. (*Id.,* at p. 895.) *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242], considered the standard of review to be applied to an administrative decision of the Commissioner of Corporations approving a recapitalization plan. The court held that decisions affecting fundamental vested rights do not call merely for substantial evidence review but must be more stringently questioned under the independent judgment test. Nothing in *Bixby* sheds any light on whether the classification at issue in the present case affects a fundamental vested right of the individual.[9]

*Moore* v. *East Cleveland* (1977) 431 U.S. 494 [52 L.Ed.2d 531, 97 S.Ct. 1932], considered a zoning ordinance that made it a crime for certain related individuals to live together, including the appellants, a grandmother and her grandsons. Decrying the extent to which the ordinance invaded family privacy, the plurality opinion concluded that it violated the Fourteenth Amendment's due process clause. (*Id.,* at p. 501 [52 L.Ed.2d at pp. 538-539].) "When a city undertakes such intrusive regulation of the family . . . the usual judicial deference to the legislature is inappropriate. 'This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' [Citation.]" (*Id.,* at p. 499 [52 L.Ed.2d at p. 537].) "[W]hen the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation. [Citation.]" (*Ibid.*) Nevertheless, no finding was made that there was a fundamental right involved despite the fact that the city very explicitly contended that grandparents had no fundamental right to live with their grandsons. (431 U.S. at p. 500 [52 L.Ed.2d at p. 538].) Concluding that the ordinance "has but a tenuous relation to alleviation of the conditions mentioned by the city" (*Id.,* at p. 500 [52 L.Ed.2d at p. 538]), the court held simply that it deprived the appellants of due process.

---

[9]*Ahwahnee Hills School* v. *County of Madera,* Civ. No. 7516 (July 17, 1984), also cited by the court below and involving similar procedural rights, was ordered unpublished by the California Supreme Court (Minutes, Cal. Supreme Ct., Sept. 27, 1984) and therefore, is not citable precedent.

*Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], which held that an owner of an apartment complex may not lawfully refuse to rent to families with minor children, was based entirely on a determination that the practice was in violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and the California Fair Housing Law. (Gov. Code, § 12955.) The court expressly declined to reach appellants' claims that the practice impermissibly infringed upon their state and federal constitutional rights of familial privacy and equal protection of the law. (*Id.*, at p. 724.)

Two other cases relied upon by plaintiffs, *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123, and *City of Chula Vista* v. *Pagard* (1981) 115 Cal.App.3d 785 [171 Cal.Rptr. 738], involve zoning restrictions defining "family" restrictively so as to limit the number of unrelated persons permitted to live together in single family residential neighborhoods. These decisions hold that the distinctions drawn by the respective ordinances between related and unrelated persons violated the right of privacy guaranteed by article I, section 1, of the California Constitution. (*City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d at p. 134; *City of Chula Vista* v. *Pagard, supra,* 115 Cal.App.3d at p. 793.) *Chula Vista* relied heavily upon the fact that legitimate government ends were "not served in any substantial way by the challenged ordinance." (*Id.*, at p. 793; see also *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d at pp. 132-133.) Neither case was determined on equal protection grounds nor did either create or discuss a "fundamental right" of the type claimed here. Moreover, in both of these cases, as in *Moore* v. *East Cleveland, supra,* the ordinance or practice at issue *directly prohibited* persons living together whose relationship to one another did not meet specified levels of kinship. That is neither the aim nor, so far as the record shows, the consequence of the foster care statutes and regulations challenged in this case.

Plaintiffs' assertion that the California foster care program impinges upon a fundamental right to live with one's extended family is also hard to square with *Ramos* v. *Montgomery, supra,* 313 F.Supp. 1179. *Ramos* turned away an equal protection challenge to the California welfare scheme allowing more money per child to children in foster care than was paid under basic AFDC to natural parents for maintenance of their own children. Despite its recognition that "maintenance of the family structure is a paramount purpose behind the federal program of granting aid for the care of children" (*id.*, at p. 1181), the *Ramos* court utilized the rational basis test ordinarily appropriate for social welfare classifications. Presumably, the court would have applied heightened scrutiny had it believed the right to live with natural parents was fundamental and that it was adversely affected by the differentiation in benefit levels.

No case that we have found identifies the right to live with one's relatives as a fundamental interest for purposes of equal protection analysis. Moreover, legislative classifications limiting eligibility for public welfare assistance have been subjected to rational basis review and sustained despite impairment of rights and interests of families that seem to us at least as important as those at stake here. (*Dandridge* v. *Williams, supra,* 397 U.S. 471, 483-487 [25 L.Ed.2d 491, 500-503]; *Murrow* v. *Clifford* (D.N.J. 1975) 404 F.Supp. 999; *Ramos* v. *Montgomery, supra,* 313 F.Supp. 1179.)

The sole exception of which we are aware to the longstanding rule that rational basis review will be applied to social welfare legislation occurs in the recent case of *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199 [211 Cal.Rptr. 398, 695 P.2d 695]. In *Robbins,* the court addressed the constitutionality of a resolution passed by the Sacramento Board of Supervisors enabling the County Department of Social Welfare to replace cash grants with "in-kind" benefits for single and employable applicants for general assistance. As a condition of receiving these "in-kind" benefits applicants were required to live in a highly restrictive county facility, consisting of open dormitories with shared toilet facilities. Permission to enter the facility had to be obtained from the staff. Meals were scheduled three times a day for thirty-minute periods. Telephone use was limited. A "bedcheck" was conducted every night at 9 p.m.; residents were required to be present at that time, and could not leave until morning. (*Id.,* at p. 204.) As stated by the court, "[r]esidents of the facility no longer decide when or with whom they eat, dress, bathe, and sleep. They have no control over what and when they eat. They are not allowed to decide when and where they will have visitors. In short, the residents forego the privacy other citizens enjoy." (*Id.,* at p. 207, fn. omitted.)

In determining that the plaintiffs had established a strong likelihood they would prevail on the merits of their statutory and constitutional claims, the court pointed out that "the right to privacy [set forth in Cal. Const., art. I, § 1] has been held to protect a diverse range of personal freedoms. [Citations.] . . . [including] the right to choose the people with whom one lives" . . . [and that] '[f]reedom to associate with people of one's choice is a necessary adjunct to privacy in the family and the home.'" (*Id.,* at p. 213, quoting *People* v. *Katrinak* (1982) 136 Cal.App.3d 145, 153 [185 Cal.Rptr. 869].) For these reasons, the court suggested that the county's "in-kind" benefits policy infringed plaintiffs' constitutional right to privacy. Accordingly, the court stated, the "'government bears a heavy burden of demonstrating the practical necessity for the limitation.' (*Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505 . . . .)" (*Id.,* at p. 213.)

Though *Robbins* appears to recognize that the "right to choose the people with whom one lives" (*ibid.*) is a fundamental right protected under the privacy clause of our state constitution, the facts of *Robbins* are so manifestly different from those that confront us here that the case is not fairly analogous and cannot be deemed controlling. The statutes and regulations with which we are concerned certainly do not on their face prohibit family members from living together. Foster children living with relatives remain eligible to receive basic AFDC payments designed to meet essential needs. Additional needs are satisfied by social welfare services. Moreover, there is no evidence in the record before us indicating that foster children living with relatives receive lesser financial support, through the state and federal AFDC programs or otherwise, than the children would receive if they remained with their natural parents.

■ The California Supreme Court has observed that, "Although a fundamental interest may be involved . . . not every limitation or incidental burden on a fundamental right is subject to the strict scrutiny standard. When the regulation merely has an incidental effect on exercise of protected rights, strict scrutiny is not applied. (E.g., *Zablocki* v. *Redhail* (1978) 434 U.S. 374 . . . [regulations affecting the right to marry]; *Califano* v. *Jobst* (1977) 434 U.S. 47 . . . [same]; *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 303-305 . . . [reasonable limitations on placement of newspaper racks]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 670 . . . [rational basis standard applicable to numerous statutes detailing the mechanisms of the right to vote].) It is only when there exists a real and appreciable impact on, or a significant interference with the exercise of the fundamental right that the strict scrutiny doctrine will be applied. [Citations.]" (*Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 47 [157 Cal.Rptr. 855, 599 P.2d 46]; *Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438]; see *Rittenband* v. *Cory* (1984) 159 Cal.App.3d 410, 421-422 [205 Cal.Rptr. 576].) Any impact by the foster care benefit limitations on the claimed right to live with relatives is "unintended, indirect, and, in any case, attenuated . . . ." (*Rittenband* v. *Cory, supra,* 159 Cal.App.3d 410, 423.)[10]

■ Accordingly, we evaluate the merits of the classification here at issue by the rational basis test, i.e., does the legislation meet the test of reasonableness? (See *McCourtney* v. *Cory* (1981) 123 Cal.App.3d 431, 439 [176 Cal.Rptr. 639].)

---

[10]Plaintiffs also argue that although the limitation on foster care benefits to children living with relatives might not *directly* infringe a fundamental right, the foster care benefit limitation nevertheless imposes an unconstitutional condition on the exercise of fundamental rights. (*Robbins* v. *Superior Court, supra,* 38 Cal.3d 199; *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252.) As we have held that the underlying right asserted in this case is not fundamental in the constitutional sense, we need not address this contention.

## IV.

██ "The California Supreme Court has expressed the rational basis test in various ways. 'Some decisions require that the classification "'bear some rational relationship to a conceivable legitimate state purpose'" (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16 . . .); others, that the classification must rest upon "some ground of difference having a fair and substantial relation to the object of the legislation" (*Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 . . .; *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861 . . .).' (*Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].) [Fn. omitted.] In *Newland* v. *Board of Governors, supra,* the court recognized the differences in terminology without choosing between them, holding that whichever 'linguistic formulation' is employed, the court must conduct "'a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals" [citation] . . . .' (*Newland* v. *Board of Governors, supra,* 19 Cal.3d 705, 711; see *Cooper* v. *Bray* (1978) 21 Cal.3d 841, 848 [148 Cal.Rptr. 148, 582 P.2d 604].)"[11] (*Rittenband* v. *Cory, supra,* 159 Cal.App.3d 410, 424-425.) We proceed with such an analysis.

At the time the parallel federal and state foster care programs with which we are here concerned were established, our Legislature declared that the purpose of foster payments was the provision of the "best substitute" home for those dependent children needing foster care. (Former Welf. & Inst. Code, § 11205, repealed 1982.) The legislative policy was restated in 1982: "The Legislature finds and declares that the family unit is of fundamental importance to society in nurturing its members, passing on values, averting potential social problems and providing the secure structure in which citizens live out their lives. . . ." (Welf. & Inst. Code, § 11205.) The parties agree that "[t]he overriding state policy for foster care of neglected and/or dependent children is to provide such children with the best possible substitute home."

The parties also agree that for those children who cannot be returned to their parental homes, the objective of the state's foster care program is to provide stable, long-term out-of-home care. Criteria for foster care selection reflect a recognition that, all other pertinent considerations being equal, placement with a relative has the highest priority.[12] Although the parties

---

[11]In *Cory* v. *Shierloh* (1981) 29 Cal.3d 430, 440 [174 Cal.Rptr. 500, 629 P.2d 8], the court sustained a classification as "both founded upon a possible rational basis and reasonably related to a legitimate state purpose."

[12]MPP section 30-336 provides in relevant part that "[w]hen placing a child, the social worker shall adhere to the following priority order: [1] The home of a relative . . . [2] A licensed family home or a family home certified by a licensed homefinding agency. [3] A family home which has been certified pending licensure. [4] A licensed group home."

dispute whether placement with a relative is of *primary* importance, both recognize that, ordinarily, placement with a relative serves the best interests of the child.[13] Plaintiffs view placement with relatives as required to meet the central legislative purpose of providing the best possible substitute home for those children in need of out-of-home care and claim this central purpose is undermined by denial of benefits to foster children living with relatives. Plaintiffs further point to the Department's concession that the needs of foster children placed with relatives are no different from the needs of children placed with strangers or in institutions, arguing that "differentiation between children equally in need 'based on a living arrangement bearing no relationship to special needs that the AFDC-FC program was created to meet' is simply unreasonable." (Respondent's brief, pp. 43-45, quoting *Miller* v. *Youakim, supra,* 440 U.S. at p. 145 [59 L.Ed.2d at p. 209].)

The Department counters that although importance is given to placing a child with relatives under the foster care program goals, the preeminent purpose of the legislative program is to provide for *all* of this state's abused, neglected and orphaned children, not just those fortunate to have relatives available to care for them (see Welf. & Inst. Code, §§ 19.1, 10000) and to do so within the limits of public revenues made available for this purpose.[14] (*Id.,* § 10001, subd. (a).) Moreover, though the Department's regulations contemplate that placement with a relative will usually best serve the needs of the child, the regulations make the best interests of the child, not the fact of a relationship by blood or marriage, ultimately the most significant consideration.

In the absence of an expressed legislative intention that foster placement with relatives shall necessarily take precedence over all placement alternatives, we agree with the Department that the legislative goals by which we must measure the reasonableness of the challenged classification are those pertaining to all social services programs; namely, the mandate to provide "protection, care, and assistance to the people of the state in need thereof" (Welf. & Inst. Code, § 10000) "within the limits of public resources" (Welf. & Inst. Code, § 10001, subd. (a)). As applied to the AFDC-FC program, this simply means that the maximum number of abused, neglected and orphaned children in need of foster care must be provided such assistance within the limits of public funds available for this purpose.

---

[13]The reason the Department gives priority to placement with a relative is not due to any state legislative directive but because section 675 (5)(A) of title 42 of the United States Code "specifies that foster care placement shall be in the least restrictive, i.e., most family-like, setting in close proximity to the parent's home, consistent with the best interest and special needs of the child." (MPP 30-336)

[14]In this connection, the Department estimates that it would cost the state an additional $38,063,000 per year if relatives are included in the state foster care program.

(See *County of Kern* v. *Coley* (1964) 229 Cal.App.2d 172, 178 [40 Cal.Rptr. 53].)

With this goal as our yardstick, we conclude that the different treatment accorded foster children cared for by relatives and those cared for by others meets the test of reasonableness. That is, we believe the Legislature's denial of benefits to children provided foster care by relatives is rationally calculated to achieve the goal of providing the maximum amount of needed foster care with available public funds.

A rationale that justifies this legislative treatment involves the judgments that more children in this state are in need of foster care than are now receiving it; that persons having a family tie to a child in need of foster care will often provide such assistance without any financial incentive to do so; that persons having no family tie to such a child ordinarily will not provide foster care unless financially induced to do so; and that if the savings resulting from the denial of benefits to related foster parents were instead used to increase the benefits to unrelated foster parents, more foster care would be provided to all children in need thereof than if the limited public funds available for this purpose were used to provide benefits to related as well as unrelated foster parents.

The only element of the foregoing rationale which plaintiffs challenge is the assumption that relatives will provide foster care without financial inducement. But their insistence that the denial of benefits operates to discourage the acceptance of parentless children by relatives is not only unsupported in the record, but is to some extent contradicted by the scant evidence plaintiffs themselves provide. The declarations of all representatives of the plaintiff class show that even relatives with very low incomes are highly motivated to care for their related foster children and do not reject them despite resulting sacrifices one would not expect of foster parents absent the family tie. None of the declarations submitted by plaintiffs indicate that the denial of state foster care benefits to foster children living with relatives actually has the effect of compelling or inducing such relatives to refuse to accept related foster children or to relinquish them to unrelated foster parents or even seriously to consider such alternatives. In short, plaintiffs have not made the factual showing necessary to support the theory of their case.[15]

---

[15]In a brief filed with the trial court, plaintiffs sum up the "prejudicial burden" described by the declarations of their clients as follows: "In each case, foster care benefits were denied because of some relationship with the foster parent. In each case, these children who have already suffered the loss of their parents and home, face the possibility of severance of remaining family ties and separation from siblings, and the knowledge that their foster parents suffer hardship in keeping them. In each case, the foster parent is forced to choose

■ Plaintiffs attempt to shift to the Department the burden of proving that relatives will provide foster care without financial incentives equal to those provided unrelated foster parents. It is not the Department's responsibility to offer such proof, however, because under a rational basis analysis "the burden of demonstrating the invalidity of a classification . . . rests squarely upon *the party who assails it*. [Citations.]" (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 17 [112 Cal.Rptr. 786, 520 P.2d 10], italics in original.)

■ Plaintiffs' final argument is that the state cannot shift the burden of providing support for children to nonlegally liable relatives. (See *Waits* v. *Swoap, supra,* 11 Cal.3d 887, 895-896; *King* v. *Smith* (1968) 392 U.S. 309, 327-329 [20 L.Ed.2d 1118, 1131-1132, 88 S.Ct. 2128]; *Lewis* v. *Martin* (1970) 397 U.S. 552, 559 [25 L.Ed.2d 561, 90 S.Ct. 1282]; *Van Lare* v. *Hurley* (1975) 421 U.S. 338, 345-346 [44 L.Ed.2d 208, 214-215, 95 S.Ct. 1741]; *Jenkins* v. *Georges* (W.D.Pa. 1969) 312 F.Supp. 289, 292; *Marotti* v. *White* (D.Conn. 1972) 342 F.Supp. 823, 826-827; *Boucher* v. *Minter* (D.Mass. 1972) 349 F.Supp. 1240, 1244-1245.)

In making this argument, plaintiffs rely most heavily upon Justice Tobriner's opinion in *Waits* v. *Swoap, supra,* 11 Cal.3d 887. That case involved the validity of an AFDC regulation which authorized deductions from the basic AFDC benefit to a recipient child if the child resided with nonneedy relatives; the regulation rested on the "assumption that the nonneedy relative who agrees to take an AFDC child into his home is necessarily both willing and able to make a gift of housing and utilities to that child . . . ." (*Id.,* at p. 891.) According to Justice Tobriner: "The objective of the challenged regulation is apparently to reduce state expenditures for AFDC children at the expense of relatives who willingly take such children into their homes. In promulgating this unauthorized measure, the department is in reality gambling that close relatives acting as caretakers will feel a moral obligation to keep an AFDC child even though the child can no longer contribute the AFDC grant which the Legislature guaranteed. If the department 'wins' its gamble, the state will save money but only at the expense of depriving

---

between relinquishing these children so they can obtain foster care payments, or keeping the children together but without adequate funds. In each case, the fundamental purpose of the foster care program is undermined by the arbitrary denial of benefits to the best possible substitute home."

The adversities plaintiffs enumerate are either belied by the declarations themselves or are highly speculative. No declarant suggests he or she is seriously considering the relinquishment of a child. Further, the declarations establish that virtually all the foster parent relatives are providing the children in their care an environment that is not only far more emotionally secure but no less financially secure than was or could be provided by the natural parents. Thus, the declarations do not genuinely show that the purpose of the foster care program is undermined by the denial of benefits to related foster parents even if such relatives are deemed the best possible substitute parents, and the trial court made no such finding.

children of essential need items and subjecting their generous relatives to unwarranted hardships. If the department loses its gamble, as is all too possible, the children will lose the close family environment sought to be achieved by the act and the state will have to pay the higher cost of foster care. [¶] In essence, the department has so enmeshed itself in fictitious and misleading labels for the sake of reducing welfare costs that it has obfuscated the purpose of the underlying statute: the preservation, so far as possible, of the family unit, and the more fundamental purpose of the preservation of the health of the state's children, the potential leaders of tomorrow." (*Waits, supra*, 11 Cal.3d 887, 895-896, fn. omitted.)

Unlike the present case, however, the classification challenged in *Waits* appeared in an administrative regulation found to be in conflict with the controlling statutes. (*Id.*, at p. 889.) Here, the regulation carries into effect the mandate of the Legislature[16] and it is that legislative directive that is at issue. Additionally, *Waits* addressed a regulation affecting basic AFDC grants. The amounts deducted were considered "income" to the children in the form of housing and utility benefits. Relatives were in effect being required to pay for the child's basic needs. Here, the children in question are not deprived of AFDC designed to meet their basic needs.

■ The rationale offered by the Department to demonstrate the reasonableness, and therefore the constitutionality, of the statute in question is essentially indistinguishable from that accepted by the three-judge federal district court in *Youakim* v. *Miller, supra*, 374 F.Supp. 1204, to uphold the Illinois foster care program's classification against an equal protection challenge. Because we find it persuasive as to this issue, we quote *Youakim* at length.

"At the time this statute was enacted, the Illinois General Assembly could reasonably have been concerned about how to use available public funds to provide as many foster homes as possible. It could reasonably have set out to provide for allocation of the available funds in a manner designed to

---

[16]The federal cases cited by plaintiffs similarly rely upon the conflict of the regulation at issue with the purposes of the governing legislation. Only *Boucher* v. *Minter, supra*, 349 F.Supp. 1240, purports to rest upon equal protection grounds, as well as a statutory basis. That case struck down the policy of the Massachusetts Department of Welfare of automatically reducing payments to children when the mother remarried and the stepfather lived in the same house. The court, without discussion of the standard of review, concluded that in addition to violating the Social Security Act, the practice violated both due process and equal protection clauses of the Fourteenth Amendment in that the irrebuttable presumption underlying the policy—that after remarriage children in an AFDC family do not need a shelter allowance as expenses will be paid by the stepfather—was unrealistic and arbitrary. (*Id.*, at p. 1244.) This portion of the case was dicta insofar as the case could have been decided wholly on statutory grounds. More importantly, the court failed to discuss the standard of review, but simply labeled the "irrebuttable presumption" involved.

secure the maximum number of foster parents for children who would otherwise remain parentless. A reasonable method of achieving this goal would have been to provide for the distribution of funds only to persons who would otherwise have had no particular reason or incentive for becoming foster parents rather than allocating the funds to all persons who become foster parents and thereby reducing the amount received by each; and it is on this basis that the defendants assert the classification was made. Allegedly, the state perceived a moral obligation on behalf of related foster parents to care for their related children which could not or would not be deepened by providing them a pro rata portion of the available funds. Therefore, according to the defendants, the state decided that the money which could have been allotted to related foster parents would be better used as added inducement to unrelated persons. [¶] This classification, the wisdom of which is not for us to determine, bears a rational relationship to the legitimate purpose of attempting to assure that foster homes are made available. Some related foster parents may not be able to afford the responsibility of caring for additional children,[17] but the state argues that the scheme was not enacted to alleviate this problem, and from the fact that payments are not based on the relative wealth of the foster parents, this contention is borne out. . . . [¶] [A]nalogous to the case at bar is Ramos v. Montgomery, 313 F.Supp. 1179 (S.D.Cal. 1970), aff'd, 400 U.S. 1003, 91 S.Ct. 572, 27 L.Ed.2d 618 (1971), a case involving a challenge to a California scheme under which AFDC payments made to natural parents were substantially less than payments made to foster parents. The Court in that case recognized that maintenance of the family structure was an important consideration in any child welfare program and that some natural parents were financially unable to provide suitable homes for their children, but nevertheless upheld the classification on the ground that the overriding purpose of the statute was the overall interest of the public in the protection of children [fn. omitted] and that this purpose was reasonably served by a plan which was motivated to provide as many foster homes as possible. [Fn. omitted.] The *Ramos* case is factually distinguishable from the case at bar, but the reasoning of the court is applicable here. A natural parent's responsibility to its child may stem from a legal duty, whereas a related foster parent's duty is moral, but in either case the result will generally be the same: the parent or relative is likely to care for the child. It is thus reasonable in either case for the state to adopt a program designed to induce families who would not otherwise become foster parents to assume that role. [¶] The challenged classification will cause some children to be separated from their relatives for financial reasons. The state may reasonably have concluded, however, that the greater good of the greater number of children in need of foster homes is served

---

[17]In a footnote at this point the court states: "Of course, this possibility is lessened by the fact that AFDC payments are generally available."

by the classification which has been made. It may have concluded that if the classification were not made, the state's foster homes program would be jeopardized. As the class eligible to receive payments is made more inclusive, the individual payments become smaller. The possibility exists that if related persons are added to the eligible cases, the individual payments would be reduced to an amount insufficient to induce qualified unrelated persons to provide foster homes for dependent children. Thus, the purpose of the payments would not be served, and either the fiscal integrity of the program would be impaired or the standards for approval of unrelated persons might have to be compromised. [Fn. omitted.]" (*Id.,* at pp. 1208-1209.)[18]

Although members of this court might prefer that the state provide foster care benefits to foster children living with relatives, the allocation of funds for public welfare purposes such as this must be left with the other branches of government where, as here, their determinations meet constitutional muster. As aptly stated by the United States Supreme Court in *Dandridge* v. *Williams, supra,* 397 U.S. 471, 487 [25 L.Ed.2d 491, 503]: "We do not decide today that the [state] regulation is wise, that it best fulfills the relevant social and economic objectives that [the state] might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration [citation]. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. [Citations.]"

---

[18]As we noted, *ante,* page 655, the decision of the three-judge district court in *Youakim* v. *Miller, supra,* 374 F.Supp. 1204, was later reversed by the Supreme Court in *Miller* v. *Youakim, supra,* 440 U.S. 125, on the statutory ground that the state statute was inconsistent with the federal statutes it purported to implement, which were meant to require equal benefits to children receiving foster care from relatives. In reaching this conclusion, the Supreme Court stated that it would be "unreasonable" to attribute to Congress "an intent to differentiate among children who are equally neglected and abused, based on a living arrangement bearing no relationship to the special needs that the AFDC-FC program was created to meet." (*Id.,* at p. 145 [59 L.Ed.2d at p. 209].) Plaintiffs seize upon this statement in their argument that the denial of benefits under the state AFDC-FC program is also "unreasonable." It is clear, however, that the Supreme Court used the word "unreasonable" not to describe the rationale of the statutes, but the intent attributed to Congress by the state in its failed attempt to show that the federal and state statutes were fully consistent. Nothing in the opinion in *Miller* v. *Youakim* suggests it would have been unreasonable to attribute to Congress an intent to deny benefits to related foster parents if the pertinent federal statutes were similar to the expression of state legislative purpose we deal with here.

For the foregoing reasons, the judgment is reversed. Each party shall bear its own costs on appeal.

Rouse, J., and Smith, J., concurred.

A petition for a rehearing was denied November 13, 1986, and respondents' petition for review by the Supreme Court was denied January 15, 1987.