962 F.2d 1374
 60 USLW 2697
 Sheri LIPSCOMB, By and Through Her Next Friend, Carolyn
DeFEHR; Autumn Scalf, & William Scalf, By and Through Their
Next Friend Gloria Self, on Behalf of Themselves and All
Others Similarly Situated, Plaintiffs-Appellants,
v.
Dan SIMMONS, Individually and in His Official Capacity as
Acting Director, Department of Human Resources of the State
of Oregon, & Jess Armas, Individually and in His Official
Capacity as Acting Assistant Director, Department of Human
Resources of the State of Oregon and Acting Administrator,
Children's Services Division, Department of Human Resources
of the State of Oregon, Defendants-Appellees.
 No. 87-4079.
 United States Court of Appeals,
Ninth Circuit.
 Argued En Banc and Submitted
Nov. 15, 1990.
 Decided April 27, 1992.
 
 Emily Simon and Mark Kramer, Esqs., Kramer & Fifthian-Barrett, Portland, Ore., for plaintiffs-appellants.
 Dave Frohnmayer, Atty. Gen. of the State of Ore., Virginia L. Linder, Sol. Gen., Rives Kistler, Asst. Atty. Gen., Salem, Ore., for defendants-appellees.
 Stephanie Wald, Supervising Deputy Atty. Gen., San Francisco, Cal., for amicus California Dept. of Social Services.
 Darryl L. Hamm, Morrison & Foerster, San Francisco, Cal., for amici L.W., R.S., S.M., J.R., J.R., A.T., S.W. and J.C., et al.
 Appeal from the United States District Court for the District of Oregon.
 Before: GOODWIN, TANG, FLETCHER, POOLE, D.W. NELSON, NORRIS, BEEZER, BRUNETTI, KOZINSKI, O'SCANNLAIN, and RYMER, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Oregon provides state-funded foster care benefits to all children placed by the state with non-relatives, but it does not provide state-funded foster care for children placed with relatives. We consider whether Oregon's attempt to stretch its foster care dollar violates the United States Constitution. We conclude that it does not.
 
 I. BACKGROUND
 
 2
 Class plaintiffs,[1] challenging the constitutionality of the Oregon system for state funding of foster home care in certain juvenile court placements, appeal a summary judgment order upholding the statutory scheme. A three-judge panel of this court reversed. Lipscomb v. Simmons, 884 F.2d 1242 (1989). Pursuant to Ninth Circuit Rule 35.3, the case was taken en banc. 907 F.2d 114 (9th Cir.1990).
 
 
 3
 Under Oregon law, when a child has been found to be within the jurisdiction of the juvenile court because of parental abuse or neglect, the court may make the child a ward of the court and may place the child in the legal custody of the Children's Services Division ("CSD") for care, supervision and temporary placement in a foster home. See Or.Rev.Stat. § 419.507(1)(b). Oregon participates in the federal Foster Care Maintenance Payments program, Title IV-E of the Social Security Act, 42 U.S.C. §§ 670-676. Federally funded foster care is administered under federal regulations which require equal payments to relatives and non-relatives in foster care placements that qualify for Title IV-E payments. See Miller v. Youakim, 440 U.S. 125, 126-28, 99 S.Ct. 957, 959-60, 59 L.Ed.2d 194 (1979). Oregon has a separate system for funding the foster care of children who are not eligible under Title IV-E.[2] Under this program, the State assists only children who are placed with foster parents who are not related to them. See Or.Rev.Stat. § 418.625(2). Only the state-funded child care regulations which apply to children not eligible for Title IV-E money are challenged in this case.[3]
 
 
 4
 The district court ruled on stipulated facts and cross motions for summary judgment. The relevant facts are not in dispute. The district court divided the class plaintiffs into two sub-classes:
 
 
 5
 (1) All children who have been or will be temporarily in the custody of Children's Service Division, who have been or will be placed in foster care with relatives, and who have been or will be denied foster care benefits because of defendants' policy and practice of not providing state-funded foster care benefits to children placed with relatives; and
 
 
 6
 (2) All children who have been or will be temporarily in the custody of the Children's Service Division and who have not been or will not be placed in foster care with relatives, or whose placement with relatives has been or will be terminated, because of defendants' policy and practice of not paying state-funded foster care benefits to children placed with relatives.
 
 II. DISCUSSION
 
 7
 The distinction between these two sub-classes is important to the analysis. The children in sub-class (1) do not claim that their relatives will care for them only if they get state assistance. Rather they claim only that they are entitled to state funding even though their relatives are both willing and financially able to care for them. Because members of the first sub-class will continue to have relatives as foster parents, their claim of constitutional injury is difficult to comprehend.
 
 
 8
 In contrast, the children in sub-class (2) are those who will be denied placements with relatives solely because of the Oregon policy of not providing foster care payments and benefits. In other words, the Oregon policy denies children in this sub-class opportunities for placements with two different categories of relatives: (1) relatives who have the financial resources to care for the children but are unwilling to do so without a state subsidy, and (2) relatives who are willing to care for the children but are financially incapable of doing so without the payments at issue here.
 
 
 9
 What the case boils down to is whether, in these circumstances, the United States Constitution requires the State of Oregon to fund foster placements with all relatives if it chooses to fund all foster placements with non-relatives. The social cost of Oregon's policy is to deny some children the opportunity to be placed in the homes of relatives who are financially able but unwilling to care for the children without state assistance or who are willing but financially unable to provide care without state assistance, and also to deny payments to children who are nonetheless placed in the homes of relatives.
 
 
 10
 The social benefit of Oregon's policy is that it saves an estimated $4 million biannually in money Oregon need not spend to provide foster care for those children being cared for by relatives who are both financially able and willing to provide such care without state support.[4] Oregon argues that nothing in the Constitution prevents it from taking advantage of those financially able and generous relatives who are willing to provide foster care under the existing policy in order to save that $4 million and spend it on foster care benefits for children placed with non-relatives. According to Oregon, spending those savings on foster care payments to non-relatives expands the pool of non-relatives willing and able to provide foster care. It also increases the amount of money available to each child placed with a non-relative.
 
 
 11
 Plaintiffs conceded in the district court that social welfare legislation allocating funds requires some classification of potential recipients. The case was briefed and argued in the district court on the sole question whether the state's attempt to manage its scarce child welfare funds violated the equal protection clause of the Fourteenth Amendment. No effort appears to have been made to resolve the question on statutory grounds, as was the case in Miller v. Youakim, 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979).[5] On appeal the parties again avoided statutory questions and argued the case as a constitutional equal protection claim.
 
 
 12
 Under equal protection, state social and economic legislation ordinarily is entitled to broad deference from the federal courts and will be sustained so long as it is rationally related to a legitimate state interest. See, e.g., Exxon Corp. v. Eagerton, 462 U.S. 176, 195-96, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983). As the Supreme Court explained in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970):
 
 
 13
 In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).
 
 
 14
 ....
 
 
 15
 [T]he intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration, Goldberg v. Kelly, [397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ]. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.
 
 
 16
 Id., 397 U.S. at 485-87, 90 S.Ct. at 1161-63 (citations omitted). Appellants argue in the alternative that the statute either fails the usual rationality review or triggers heightened scrutiny which it is unable to satisfy.
 
 A. The Case for Heightened Scrutiny
 
 17
 Legislative classifications are subject to a heightened standard of scrutiny when they disadvantage a "suspect" or "quasi-suspect" class or burden the exercise of fundamental rights independently protected against governmental interference. See, e.g., City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).
 
 1. Suspect classifications
 
 18
 Oregon's policy of excluding relatives from state foster care payments, say the plaintiffs, denies the children as well as their relatives equal protection of the laws. Plaintiffs invite us to recognize a new suspect class for purposes of equal protection analysis: children who have been removed from abusive homes and who are related to their (potential) foster parents. We decline the invitation.
 
 
 19
 To the extent plaintiffs contend that Oregon's classification scheme disadvantages relatives vis a vis non-relatives, we note that the Supreme Court has declined to recognize close relatives as a suspect or quasi-suspect class for equal protection purposes. See Lyng v. Castillo, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986). To the extent plaintiffs' claim implies that the non-affluent constitute a suspect or quasi-suspect class, it likewise cannot be sustained. Courts have refused to fashion equal protection into a judicial tool to redress economic inequalities. See Dandridge v. Williams, 397 U.S. at 483-87, 90 S.Ct. at 1160-63.
 
 2. Interference with fundamental rights
 
 20
 Plaintiffs also maintain that Oregon's classification scheme violates equal protection because it impinges on the exercise of their fundamental constitutional right to live with extended family members. Although the Supreme Court has never squarely held that the right to maintain relationships with one's family members is a fundamental right protected by the Constitution, there is substantial authority for the proposition that due process places a limit on the state's ability to interfere with certain extant relationships among family members. See, e.g., Moore v. City of E. Cleveland, 431 U.S. 494, 499, 503, 97 S.Ct. 1932, 1935, 1937, 52 L.Ed.2d 531 (1977) (plurality); Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639-40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573-74, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).[6]
 
 
 21
 The existence of a negative right to freedom from governmental interference, however, does not dictate the recognition of an affirmative right on the part of foster children to be placed by the state with relatives. The government generally is under no obligation to facilitate or fund the exercise of constitutional rights. See Harris v. McRae, 448 U.S. 297, 316-17, 100 S.Ct. 2671, 2687-88, 65 L.Ed.2d 784 (1980); Maher v. Roe, 432 U.S. 464, 478-80, 97 S.Ct. 2376, 2385-86, 53 L.Ed.2d 484 (1977). As the Supreme Court has explained:
 
 
 22
 [O]ur cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. As we said in Harris v. McRae: "Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference ..., it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom." 448 U.S. at 317-318, 100 S.Ct. at 2688 (emphasis added).
 
 
 23
 DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196, 109 S.Ct. 998, 1003-04, 103 L.Ed.2d 249 (1989) (citations omitted).
 
 
 24
 Plaintiffs attempt to distinguish DeShaney and the public funding cases based on the state's temporary custody of plaintiffs. Because of this custodial relationship, plaintiffs argue, Oregon is obliged to ensure that plaintiffs are able to live with their relatives. A legislative classification that fails to provide foster children this opportunity, plaintiffs conclude, violates the equal protection clause.
 
 
 25
 Certain basic principles are agreed upon. Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child. See DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1005-06; Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S.Ct. 2452, 2457-58, 73 L.Ed.2d 28 (1982); Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976).
 
 
 26
 The word "custody" is not a talisman, however. In our view, custody cases such as DeShaney and Youngberg stand for the proposition that the government has an affirmative obligation to facilitate the exercise of constitutional rights by those in its custody only when the circumstances of the custodial relationship directly prevent individual exercise of those rights. The Supreme Court made this principle clear in DeShaney:
 
 
 27
 [W]hen the State by its affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.
 
 
 28
 489 U.S. at 200, 109 S.Ct. at 1005-06 (citations omitted).
 
 
 29
 Significantly, Oregon's classification does not prohibit any foster child from living with his or her relatives. See Lyng, 477 U.S. at 638, 106 S.Ct. at 2729 (holding that a regulation that did not provide certain payments to relatives, but did not "order or prevent" relatives from associating, did not "directly and substantially" interfere with any fundamental right). The barrier to plaintiffs' exercise of any fundamental right is that their relatives either lack or are unwilling to spend the money to take care of them. Because Oregon has no affirmative obligation to fund plaintiffs' exercise of a right to maintain family relationships free from governmental interference, we decline to apply heightened scrutiny and consider only whether Oregon's classification is rationally related to a legitimate state interest.B. Rational Basis Review
 
 
 30
 In weighing the validity of the classification of foster children by the State of Oregon, we need not ascertain the actual reason for the classification but may consider any facts from which the state reasonably could have concluded that the challenged classification would promote a legitimate state purpose. See, e.g., Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981); New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam); McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).
 
 1. Conceivable basis test
 
 31
 We believe there are valid state interests which could motivate Oregon to allocate state welfare funds differently in the two classes of foster home placements. Oregon has chosen to furnish, alternatively, foster home placement with relatives willing to provide foster care without CSD payments or, if no willing relative is available, foster care purchased in the foster care market. The state has a rational basis for not paying state funds to family members who provide foster care: The state wishes to take advantage of relatives who are willing and able to take care of foster children regardless of whether they receive help from the state. Thus, the state hopes to maximize the amount of money available for the benefit of abused and neglected children in need of foster care. Larger CSD foster care payments per child may serve at least two purposes. They may give foster parents the ability to provide better care for unrelated children. They may also expand the pool of qualified foster parents by attracting more people into the foster care market.
 
 
 32
 The problem confronting Oregon is straightforward: It simply does not have enough money to pay for every child needing foster care. The legislature reasonably could have decided to spend more of the funds allocated to the foster care program to recruit well-qualified providers who might need the additional financial incentive to be willing to serve as foster parents and to enable them to provide a higher level of care, rather than to spread the money equally among a smaller universe of providers that would include relatives. In addition, the availability of federal AFDC monies for needy relatives willing to serve as foster parents could have persuaded the Oregon policy makers that their decision not to extend CSD benefits to related foster parents was the most rational way to allocate the finite resources available to the state.[7] By traditional standards of judicial review of social welfare legislation, such reasoning is not irrational.
 
 
 33
 Oregon's decision to spend more money per child not placed with relatives while depriving some children of the option of living with relatives--instead of paying less money per child but enabling more children to live with relatives--is a policy decision. That decision may or may not be the decision that the members of this court would make after balancing the social costs against the social benefits. But that cost-benefit analysis is appropriately made by Oregon officials, not by the federal judiciary. Our inquiry is limited to whether Oregon's policy choice bears a rational relationship to the legitimate purpose of maximizing the level of benefits available to all the children in the foster care program. We conclude that it does.
 
 
 34
 Neither Oregon's policy nor our decision today is without precedent. Oregon is not alone in its policy of not supporting relative placements of children who do not qualify for Title IV-E funds, and we are not alone in finding such a policy constitutional. Courts have upheld similar policies adopted by at least two other states, California and Illinois. As the district court in this case noted, a three-judge district court rejected an equal protection challenge to the Illinois policy for reasons equally applicable here:
 
 
 35
 At the time this statute was enacted, the Illinois General Assembly could reasonably have been concerned about how to use available public funds to provide as many foster homes as possible. It could reasonably have set out to provide for allocation of the available funds in a manner designed to secure the maximum number of foster parents for children who would otherwise remain parentless....
 
 
 36
 The challenged classification will cause some children to be separated from their relatives for financial reasons. The state may reasonably have concluded, however, that the greater good of the greater number of children in need of foster homes is served by the classification which has been made. It may have concluded that if the classification were not made, the state's foster homes program would be jeopardized. As the class eligible to receive payments is made more inclusive, the individual payments become smaller. The possibility exists that if related persons are added to the eligible class, the individual payments would be reduced to an amount insufficient to induce qualified unrelated persons to provide foster homes for dependent children. Thus, the purpose of the payments would not be served, and either the fiscal integrity of the program would be impaired or the standards for approval of unrelated persons might have to be compromised.
 
 
 37
 Youakim v. Miller, 374 F.Supp. 1204, 1208-09 (N.D.Ill.1974) (rejecting the constitutional challenge), vacated on other grounds, 425 U.S. 231, 96 S.Ct. 1399, 47 L.Ed.2d 701 (1976) (remanding for reconsideration in light of intervening administrative interpretation of the AFDC statute), on remand, 431 F.Supp. 40 (N.D.Ill.1976), aff'd, 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979). See King v. McMahon, 186 Cal.App.3d 648, 667-69, 230 Cal.Rptr. 911, 923-24 (1986) (quoting Youakim ).[8]
 
 2. Specific applications
 
 38
 Critics of Oregon's policy argue that the allocation of resources is not the only relevant consideration. The state, they argue, in assuming parens patriae responsibility for a child, must be guided by a consideration of the child's best interests. That is a modest enough demand with which few will disagree. Indeed, the Oregon legislature has required CSD to design its rules and regulations "to protect the best interests of children in foster homes." Or.Rev.Stat. § 418.640(1). Requiring the state to watch out for the best interests of its foster children is not to say, however, that every child is entitled to the optimal foster care placement available to him or her. In our view, the Constitution requires only that the State provide adequate care to the children in its custody.
 
 
 39
 Critics of Oregon's classification assert that a child is likely to be better off in the home of a relative than with strangers. The critics state a proposition not likely to provoke extended debate, see, e.g., Miller v. Youakim, 440 U.S. at 141, 99 S.Ct. at 967, and Oregon law in fact embodies a preference for placing foster children in the homes of relatives where possible. See Or.Admin.R. 412-27-045. Granting the accepted generalities, the case for declaring the plan irrational proceeds next to show that the plan results in unfavorable results in the cases of individual plaintiff children. The critics contend that such outcomes, in which Oregon departs from its stated preference for placing children with relatives but realizes no countervailing cost savings, are irrational and render the entire policy unconstitutional. See Dissent at 1387-88.
 
 
 40
 As discussed below, we do not agree that Oregon's foster care policy has produced irrational outcomes. We must emphasize, however, that the equal protection clause has never been interpreted to require that social welfare legislation produce a rational result in every application or that it perfectly advance the government's legitimate policy interests. The legislature "need not draw a statutory classification to the satisfaction of the most sharp-eyed observers" in order to meet the requirements of equal protection. See Lyng v. Automobile Workers, 485 U.S. 360, 372, 108 S.Ct. 1184, 1193, 99 L.Ed.2d 380 (1988). As the Supreme Court has recognized, generalized rules are essential in administering public welfare programs and pass constitutional muster "even though such rules inevitably produce seemingly arbitrary consequences in some individual cases." Califano v. Jobst, 434 U.S. 47, 53, 98 S.Ct. 95, 99, 54 L.Ed.2d 228 (1977). Accordingly, courts have ignored individual anomalies and have inquired only whether there is a rational basis for the program viewed as a whole. See, e.g., Bowen v. Gilliard, 483 U.S. 587, 599-600, 107 S.Ct. 3008, 3016-17, 97 L.Ed.2d 485 (1987); United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 177-79, 101 S.Ct. 453, 460-62, 66 L.Ed.2d 368 (1980); Weinberger v. Salfi, 422 U.S. 749, 777, 95 S.Ct. 2457, 2472, 45 L.Ed.2d 522 (1975).
 
 
 41
 It is flattering to be told by litigants that we have the wisdom and the power to know what is best, and to order it done in every case in which, without our intervention, a bureaucratic solution would produce a less than ideal result in an individual application. However, we have been given no such mandate and should be cautious about reaching out for it.
 
 3. Adequacy of care
 
 42
 There is no evidence in this case that any child has been denied an adequate foster care placement as a result of the operation of Oregon's policy. Named plaintiff Sheri Lipscomb's circumstances are illustrative. The stipulated facts are that Sheri is a disabled child who was removed from her home because of abuse and neglect by her parents. She was fortunate enough to have her aunt and uncle, Carolyn and Robert DeFehr, agree to serve as her temporary foster parents despite Oregon's policy of denying them funding. They have continued to provide a home for Sheri even though they fear that at some point they will have to give her up because they may be unable to pay for her medical care. There is no evidence in the record, however, that Sheri would not receive adequate or equivalent care if placed with a nonrelative.
 
 
 43
 In the case of the other named plaintiffs (Autumn and William Scalf), the parties have stipulated that they were unable to remain with related foster parents as a result of Oregon's policy. Once again, however, there is no evidence that their placement with unrelated foster parents has denied them adequate care. A tendered affidavit to the effect that they have had difficulty in practicing their religion was not a part of the district court record. There is no claim before us that this difficulty, if any, rises to the level of a First Amendment violation or a denial of adequate care. Because such a claim is not before us, we do not consider what steps the First Amendment might require Oregon to take in accommodating the religious needs of foster children.[9]
 
 
 44
 The cases of Sheri Lipscomb and the Scalfs are not examples of inadequate care caused by Oregon's policy. They are illustrative of only a part of the complex task faced by Oregon and other states in stretching finite resources to provide social services to everyone deserving of them in as fair and efficient a manner as possible. Plaintiffs would have us read the Constitution as requiring Oregon to spend money to provide what would arguably be optimal placements for some children at the expense of the vast majority of other children who need foster care, many of whom are not fortunate enough to have a relative willing and able to take them in even if state funding were available. We decline this invitation.[10]
 
 
 45
 Implicit to the critics' argument is the assumption that a placement is inadequate simply because it is with a non-relative. Although we agree with the critics that in any given case a child may be better off with a relative than with a non-relative, a placement with a nonrelative is not necessarily inadequate and thus constitutionally infirm.
 
 
 46
 Critics of Oregon's policy rest their claim on an over-generalization: those who do not qualify as relatives under Oregon law cannot provide adequate care. We find this over-generalization particularly troubling in the context of trying to determine the best interest of children who have been abused and neglected by their closest relatives: their parents. Contrary to the critics' view, we believe that in any given case the child's interests may be better served by a placement with a non-relative, particularly one who possesses the qualifications to be a superior foster parent for almost any child. Moreover, a non-relative may be available who has forged even stronger bonds with the child over time than the available relative. As the California Court of Appeal noted in upholding a California regulation similar to Oregon's policy, ultimately the most significant consideration in placing a child is "the best interests of the child, not the fact of a relationship by blood or marriage." King v. McMahon, 186 Cal.App.3d at 664, 230 Cal.Rptr. 911 (construing California's regulation). Thus, generalizations about children being better off with relatives than with non-relatives have only limited value in assessing how well a particular foster parent serves the best interests of a particular child.
 
 
 47
 This observation is especially true in Oregon because of the state's limited definition of relatives. See Or.Rev.Stat. § 418.625(2); Or.Admin.R. 412-27-030 (defining a relative as a "grandparent, sister, brother, aunt or uncle who is related by blood, adoption or marriage"). For example, a child might be far better off with an ex-step parent with whom he has bonded rather than with a distant uncle, regardless of Oregon's failure to define as a relative an ex-step parent who has not adopted the child.
 
 
 48
 This is also especially true in Oregon because placement with a relative does not indicate that the state has determined that placement with that particular relative will serve the best interests of that particular child. Rather, under Oregon law, CDS's placement reflects only the fact that the relative can provide adequate care, not that the relative is the best available foster parent for the child.[Oregon] ... will protect a child's right to live with his or her immediate or extended family except when there is indication that family members will not adequately provide for the child's welfare. In determining either the temporary or permanent placement of a child, CSD will consider placement with relatives in preference to person that the child does not know if there is reason to believe that the child's relatives will be able to provide appropriate care, stability and security for the child.
 
 
 49
 Or.Admin.R. 412-27-045 (emphasis supplied). There is therefore no support for the dissent's assertion that, in denying the members of the second subclass a placement with relatives, the state has necessarily denied the children "the care and companionship of those adults who, in the state's own professional judgment, are best suited to provide them a loving family environment." Dissent at 1390 (emphasis in the original).
 
 III. CONCLUSION
 
 50
 In a perfect world perhaps every juvenile ward could have a custom-made child care plan funded by the state, giving both the benefits of care provided by loving relatives and medical services, counseling, and other professional services that would answer that child's particular needs at no cost to those relatives. The State of Oregon, finding itself in an imperfect budgetary environment, believed that it has allocated its limited resources in the best possible way in order to accomplish the goals of its foster care program.
 
 
 51
 At argument it was suggested that Oregon would be on firmer constitutional ground if it were to fashion a need-based schedule of payments to relatives providing foster care. The state is free to adopt any statutory scheme that meets minimal constitutional requirements. It is not the function of the judicial branch of the federal government, however, to fashion new and improved child-care plans for the states. Whether we would vote for the state's plan if it were placed before us as members of the legislative assembly is not the question we are to decide.
 
 
 52
 The judgment of the district court is AFFIRMED.
 
 
 53
 KOZINSKI, Circuit Judge, with whom FLETCHER, POOLE and D.W. NELSON Circuit Judges, join, dissenting.
 
 
 54
 "Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand." Stanley v. Illinois, 405 U.S. 645, 656-57, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972).
 
 
 55
 The majority recognizes that "[t]he state, ... in assuming parens patriae responsibility for a child, must be guided by a consideration of the child's best interests." Maj.Op. at 1381. It also recognizes that "a child is likely to be better off in the home of a relative than with strangers" and that "in any given case a child may be better off with a relative than with a nonrelative." Id. at 1381 & 1383. Nonetheless, it upholds the Oregon system, reasoning that "courts have ignored individual anomalies and have inquired only whether there is a rational basis for the program viewed as a whole." Id. at 1382.
 
 
 56
 We agree, of course, that in the normal case where a federal court reviews the constitutionality of state social or economic legislation, the fourteenth amendment requires courts to concentrate on "programs as a whole" rather than on "individual anomalies." But this is not the normal case. Far from it. Oregon has intentionally placed itself in a conflict of interest situation: Having undertaken responsibility for the fate of these children, it has nevertheless adopted policies that have the potential to cause them serious harm. And the justification given for those policies is entirely in terms of the state's own fiscal self-interest. As with any fiduciary, the state may make some decisions that place its own interests above those of its wards. But having taken on the mantle of a fiduciary, the state is not entitled to the same degree of deference as when it is acting in a purely legislative or administrative capacity. It is with these principles in mind that we review the Oregon child care system and find it wanting.[1]
 
 
 57
 A. As the majority acknowledges, even social welfare programs are subject to some judicial oversight. The state may not, for example, allocate resources so as to violate substantive constitutional guarantees. See, e.g., Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971) (state classifications based on race, nationality or alienage are "subject to close judicial scrutiny"); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (state classifications that penalize the exercise of a constitutional right must "be necessary to promote a compelling governmental interest"). Nor may it act in a wholly irrational or arbitrary manner. See, e.g., United States Dep't of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (striking down as irrational the Food Stamp Act's exclusion of households containing individuals unrelated to any other household member). Admittedly, Oregon's foster care scheme does not appear to violate any constitutional guarantee requiring strict scrutiny; the distinction drawn between those who may and those who may not collect foster care benefits does not turn on membership in a protected class or unduly burden the exercise of a protected right. The question, then, is whether the distinction is rational.
 
 
 58
 The state argues that the distinction is rational because it saves money. Even where there is no legal obligation to do so, the state explains, people are often willing to take responsibility for the children of relatives. By denying foster care benefits to children who are under the care of their relatives, the state procures free foster care for a large class of children who would otherwise have to be maintained at state expense. This, the state argues, enables it to conserve resources, increasing the funds it can devote to children who are truly needy--those who do not have relatives to support them. Were this the only consideration, we could find little fault with Oregon's statutory scheme. The situation, however, is far more complex.
 
 
 59
 Oregon's foster care system is not a run-of-the-mill welfare scheme. In removing children from the custody of parents who are unable, unwilling or unfit to take care of them, the state performs a very significant--and very delicate--governmental function. Because children normally have no resources of their own, and very young children lack the wherewithal to provide for their own upkeep, they depend on adults for the necessities of life and for the other resources they need to become healthy, productive and well-adjusted adults. Schall v. Martin, 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984); see also Bellotti v. Baird, 443 U.S. 622, 634, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797 (1979) (plurality). Normally these resources are provided by their parents; every child has a legitimate expectation, if not entitlement, to be supported by the adults who brought him into the world.[2] But when, because of death or disability, criminality or drug abuse, the child's parents fail to provide these resources, the state normally steps in to make sure the child receives the necessary care. Indeed, every state in the union has undertaken to care for its abandoned, neglected and mistreated children. In so doing, states take on very significant responsibilities.
 
 
 60
 The process starts with removing the child from the custody and control of those to whom he is entitled to look for support and nurture. "When the minor must be removed from the custody of his parents for his own welfare ... the state assum[es] the parents' role...." In re Eric J., 25 Cal.3d 522, 530, 601 P.2d 549, 159 Cal.Rptr. 317 (1979); accord Martin, 467 U.S. at 265, 104 S.Ct. at 2410 (when parental control falters, the state steps in as parens patriae ); In re Daedler, 194 Cal. 320, 326, 228 P. 467 (1924) ("[When] the State, as parens patriae, has succeeded to [the child's] control, [it] stands in loco parentis to him."). The weighty and sensitive responsibilities of parenthood--with its focus on the well-being of the child--devolve upon the state. It is settled, therefore, that when the state exercises power over children as parens patriae, it "exercises a discretion in the interest of the child." New York Foundling Hosp. v. Gatti, 203 U.S. 429, 439, 27 S.Ct. 53, 55, 51 L.Ed. 254 (1906); accord Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982) (the state's interest as parens patriae is in preserving and promoting the welfare of the child); In re Eugene W., 29 Cal.App.3d 623, 629, 105 Cal.Rptr. 736 (1972) (state as parens patriae has a duty to act in the best interest of the child). See Finlay v. Finlay, 240 N.Y. 429, 148 N.E. 624, 626 (1925) (Cardozo, J.) ("[The chancellor] acts as parens patriae to do what is best for the interest of the child. He is to put himself in the position of a 'wise, affectionate, and careful parent' and make provision for the child accordingly." (citation omitted)).
 
 
 61
 B. Oregon recognizes what common sense suggests: Children in foster care are normally far better off living with relatives than with strangers. Oregon law therefore reflects a strong preference for foster care by relatives. See O.A.R. 412-27-045; see also O.R.S. 418.937.[3] The reasons for this preference are illustrated by the case before us. Sheri Lipscomb, disabled since infancy, requires continuous care and attention; "[s]he needs a lot of help, including with such things as walking, getting in and out of cars, and to the bathroom, and someone who is able to give her special care." CR 12, Affidavit of Carolyn DeFehr at 3. Her aunt and uncle are willing to provide such special care but cannot bear the financial burden; they will have to give Sheri up unless they obtain the normal benefits, especially medical insurance, to which unrelated foster parents are entitled:
 
 
 62
 Although we can feed and clothe her, we are very worried about her medical care. Her condition is slowly getting worse. She can no longer walk by herself, she falls a lot, and eventually she will need to be in a wheelchair all the time. With a handicapped child, you never know when she will be badly hurt and you have to have something. Without medical assistance, we know that eventually she will be sick or need treatment or therapy or have to go to the hospital and we will be forced to give her up because we will not be able to afford to pay for her medical care.
 
 
 63
 Id. at 3-4. Because it is very difficult to find unrelated foster parents willing and able to take care of a severely disabled child, it is likely that if Sheri leaves the DeFehrs' home, she will be placed in an institution.[4]
 
 
 64
 Autumn and Billy Scalf have already been given up by their aunt and uncle who are unable to bear the financial burden of caring for them in addition to their own three children. The Oregon Children's Services Division (CSD) found the Selfs an excellent resource for both children, and the Self home the most family-like, least restrictive setting for them. See CR 12, Affidavit of Gloria Self at 3-4. By contrast, Autumn and Billy are unhappy in their foster home and find it difficult to practice their religion:
 
 
 65
 If I cannot live with my father and have to be in foster care, I want to be able to live with my aunt and uncle. I do not know my foster parents well, and I fight with my foster sister. They have different beliefs and values than I do. I am a Jehovah's Witness and would like to attend meetings at the Kingdom Hall with my aunt and uncle. There are more things to do at their house and I feel more comfortable with them.
 
 
 66
 CR 12, Affidavit of William Scalf at 4; see also CR 12, Affidavit of Autumn Scalf at 4.[5]
 
 
 67
 In both cases, the state's policy has resulted or will result in the removal of the children from the homes of their relatives and placement in the homes of strangers or in an institution. After such removal, the state pays for the upkeep and medical care of the children. At a minimum, the state winds up paying to strangers or an institution precisely the sums it denies the children's relatives; in all probability, it ends up paying much more. As a consequence, the children are denied the care, companionship, love and attention of adults with whom they share the normal affinities of family, while the state winds up saving no money.
 
 
 68
 At oral argument, the able attorney for the state conceded that the statutory scheme works an irrational result when applied to certain class plaintiffs.[6] The state argues that the scheme nevertheless survives the test of rationality because, when viewed in its entirety, it reaches a rational result: It induces many relatives of foster children to provide free foster care, saving the state a lot of money. Sheri Lipscomb, the Scalf siblings and others in their situation--children with relatives who are willing to care for them but who can't afford to do so--are the unfortunate victims of a system that serves the rational state purpose of conserving limited resources.
 
 
 69
 C. Unlike our colleagues in the majority, we cannot accept the state's justification. To begin, the Oregon statute cannot have its intended effect when the child's relatives lack the financial resources to care for the child; you can't squeeze blood from a stone. Where the child's relatives are too poor to take on the financial burden of providing unsubsidized foster care, no degree of empathy for the child's misfortune will induce them to do that which they cannot. In those circumstances, of which there may be many,[7] the hardship imposed on the children is entirely for naught.
 
 
 70
 More fundamentally, the state may not visit serious deprivations and hardships on children like Sheri Lipscomb and the Scalf siblings for the sole purpose of inducing the relatives of other children to provide free foster care. When the state acts in loco parentis, displacing the parents of an abused or neglected child, it takes on a grave responsibility to that child, stepping into the shoes of the parents whose place it takes. See pp. 1385-87 supra. The decisions it makes with respect to the child must--as recognized by Oregon law--be guided by an overarching objective: maximizing the child's welfare. O.R.S. 418.640(1).[8] Each child is entitled to have key decisions as to its care made in light of his own best interests, rather than to serve some collateral purpose.
 
 
 71
 Unlike the majority, therefore, we believe the child has a right to individualized, rational decisions, a right which grows out of his relationship with the state. Unlike ordinary social welfare programs where eligible individuals are free to take advantage of available benefits or not as they see fit, the relationship between the child and the state is nonconsensual. Children are legally incapable of granting or refusing consent as to whether they will be removed from the home; they have no right to direct what happens to them thereafter.[9]
 
 
 72
 While the state removes the child from the home of its parents to promote what it sees as the child's best interests, its action is not always without risks and disadvantages to the child. Removal not only alters the parent-child relationship, it may deny the child the type of upbringing, education and religious training he would receive if he remained at home. The Scalf siblings, for example, may be better off for having been taken out of a home marred by alcoholism, abuse and neglect, but the state's action has exposed them to a new hardship: They are unable to practice the tenets of their faith. See p. 1387 supra. Sheri Lipscomb may wind up in an institution. While she will probably be better off there than with her abusive and drug-impaired father and stepmother, the prospect of life in an asylum may not fill her with unmitigated joy.[10]
 
 
 73
 Sheri and the Scalf siblings illustrate how complex, sensitive and subjective are the choices the state must make on behalf of children in its care. In making these decisions--decisions that have a profound impact on the children's immediate well-being and on the adults they will grow up to be--the state does far more than extend sovereign largesse; it assumes a fiduciary responsibility towards the children, warranting that it will make decisions in their best interest, not its own.[11] The state would surely be powerless to interfere in such a drastic manner with home and family life in order to serve interests unrelated to the children's welfare, e.g., because it believed this would reduce crime or enhance tax revenues.[12] Having assumed fiduciary responsibilities vis-a-vis the child, the state may not sacrifice the child's best interests to its own financial ones.
 
 
 74
 To be sure, the state--like a parent--may take budgetary constraints into account; the child is not entitled to excessive or exorbitant subsidies, and the degree of assistance provided is subject to the state's rational judgment rendered in light of community living standards and competent professional opinion. See Youngberg, 457 U.S. at 317, 102 S.Ct. at 2458. But, as the Court stated in Youngberg, "the Constitution ... requires that the courts make certain that professional judgment in fact was exercised." Id. at 321, 102 S.Ct. at 2461 (quoting Romeo v. Youngberg, 644 F.2d 147, 178 (3d Cir.1980) (en banc) (Seitz, C.J., concurring)).
 
 
 75
 The policy adopted by Oregon has the effect of denying a significant number of children the care and companionship of those adults who, in the state's own professional judgment, are best suited to provide them a loving family environment. It is not consistent with the responsibility the state has assumed toward these children to eliminate from the class of potential foster parents those adults most likely to provide a suitable living environment, and to do so without even inquiring whether the relatives have a legitimate reason--such as lack of resources--for refusing to provide free foster care.
 
 
 76
 It is particularly perverse to conclusively deny foster care benefits to children living with needy relatives while providing the same benefits to children living with strangers or in an institution. The brunt of the state's policy falls on the children who, after all, have no say in the matter. It is the foster parents who decide whether or not they can afford to provide free care; the children cannot force the relatives to make extraordinary financial sacrifices. The state may not deny the children in its custody the most suitable placement on the basis of a circumstance over which the children have no control. Cf. Stanley, 405 U.S. at 656-57, 92 S.Ct. at 1215-16.
 
 
 77
 The state may, of course, make an individualized judgment that a particular child's relatives are not best suited to care for the child or do not need financial assistance. But a blanket rule that precludes all relatives from obtaining financial assistance, effectively excluding some of them from the class of households that can provide foster care, cannot be squared with the type of rational, compassionate, individualized judgment we must expect from the state when it takes custody of the child. See Youngberg, 457 U.S. at 321, 102 S.Ct. at 2461.[13]
 
 
 78
 Sheri Lipscomb, the Scalf siblings and the other unfortunate children in their situation are not pawns; they may not be subjected to senseless suffering, their childhoods may not be wasted, their potential as adults may not be impaired just to goad the relatives of other foster children to make financial sacrifices.[14] A mother and father who so treated their children would earn the opprobrium of the community; we should not give our imprimatur to this practice when it is adopted by the state acting in loco parentis. Children are too important--and far too vulnerable--for us to permit the state to trifle with their lives in this fashion. Because the Oregon statutory scheme is lacking in essential rationality in light of its noble purpose, we would decline to uphold it. We respectfully dissent.
 
 
 
 [1]
 By stipulation of the parties the case was certified November 15, 1991, as a class action after the state suggested that certain of the claims had become moot because of the passage of time
 
 
 [2]
 Eligibility under Title IV-E depends on whether children would be entitled to benefits under Title IV-A of the Social Security Act (Aid to Families with Dependent Children (AFDC)) in the household from which they have been removed. See 42 U.S.C. §§ 606(a), 607, 672(a)
 
 
 [3]
 It is agreed that the placement and payment decisions by the defendants constitute "state action" within the meaning of 42 U.S.C. § 1983, and that the decisions of the named defendants are made pursuant to the state statutes and regulations that are challenged in this case
 
 
 [4]
 While the controversy before us concerns only Oregon welfare allocations of state money, the invalidation of the Oregon plan would have substantial effects elsewhere in the circuit. California, for example, asserts in its amicus brief that the reversal of the district court in this case would have an immediate impact of more than $65 million per year of additional state funds that would have to be found to pay relatives over and above any funds they now receive from other programs. Brief of Amicus Curiae California Department of Social Services at 15
 
 
 [5]
 In Youakim, the Supreme Court struck down on statutory grounds, without reaching any constitutional questions, an Illinois statute that denied payments to relatives who met state licensing requirements for participation in the federal foster care benefit program currently administered under Title IV-E. See 440 U.S. at 145, 99 S.Ct. at 969
 
 
 [6]
 In the traditional due process context, the Court has likewise recognized that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982)
 
 
 [7]
 It is undisputed that various combinations of other state and federal funding are available to children placed by CSD in foster homes with relatives. Relatives offering foster home care may be eligible on a need basis for AFDC. Disabled foster children also may be eligible to receive Supplemental Security Income assistance. 42 U.S.C. §§ 1381, 1382(a); 20 C.F.R. § 416.906. Foster children who receive AFDC or SSI are automatically eligible for Medicaid. 42 C.F.R. §§ 435.110(a), 435.120
 
 
 [8]
 The California Court of Appeal noted that there was no evidence in the record that the lack of state payments discouraged relatives from providing foster care. 186 Cal.App.3d at 665, 230 Cal.Rptr. 911. The court's holding, therefore, may not be as applicable to the second subclass here
 
 
 [9]
 As noted above, the district court decided this case on stipulated facts. These facts are set forth clearly in the district court's order, and they constitute the factual record for purposes of this appeal. See District Court Opinion at 2-6; see generally 9 J. Wigmore, Evidence § 2588, at 586 (3d ed. 1940). The dissenters rely on the affidavits of Sheri Lipscomb, the Scalf children, the DeFehrs and the Selfs. Dissent at 1387-88 & nn. 5, 7. These affidavits are not evidence and were not considered by the district court in reaching its decision. Their use by the dissent is interesting. The substance of the affidavits was largely incorporated into the factual allegations of the plaintiffs' complaint, which the defendants denied. See Defendants' Answer at 2. Because the affidavits were not part of the summary judgment record upon which the district court relied, the defendants had no reason to depose the affiants, to offer counteraffidavits, or otherwise to develop a competing factual record
 In contrast to the detailed "factual" picture painted by the dissent, the parties stipulated only that Sheri Lipscomb is "a handicapped child who was removed from her home in April 1986 on account of abuse and neglect by her parents" and placed with her aunt and uncle, Carolyn and Robert DeFehr, and that the DeFehrs have no medical coverage and "are afraid that they will be forced to give her up on account of their inability to pay for her medical care." Stipulation of Facts at 2, p 2.
 In the case Autumn and William Scalf, the parties merely stipulated that the children were removed from their home in January 1986 on account of abuse and neglect by their parents and placed by CSD with their aunt and uncle, Gloria and Ron Self, where they received no state foster care benefits but did receive Title IV-E benefits for a limited time. Id., p 3. In August 1986, "at the request of Ron and Gloria Self because no foster care benefits were available for Autumn and William Scalf and because Ron and Gloria Self were concerned that they would be unable to care for the needs of Autumn and William Scalf, CSD placed Autumn and William Scalf in foster care with persons unrelated to them," where they receive state foster care benefits and related medical coverage. Id., p 4.
 
 
 [10]
 The relevant statutes direct CSD to consider the interests of all children in its custody, not one particular group. See Or.Rev.Stat. §§ 418.485, 418.640(1). CSD reasonably may balance competing claims for its limited funds in order to maximize the benefits to all children in its custody; it is not required to provide optimal benefits to plaintiffs at other children's expense
 
 
 [1]
 This case was certified as a class action after it was argued before us because one of the original plaintiffs, Sheri Lipscomb, had reached the age of majority and the other two, Autumn and William Scalf, had been appointed a guardian. Thus, none of the original plaintiffs remained a ward of the Oregon foster care system and this case appeared moot absent a class certification. Maj.Op. at 1376 n. 1. Nevertheless, we continue to rely, as does the majority, on the fact pattern presented by Sheri Lipscomb and the Scalf siblings' cases because we believe they are "illustrative" of how the Oregon system operates in practice. Id. at 1382; see also note 7 infra
 The majority's attempt to distance itself from the various affidavits presented by the plaintiffs is curious. See Maj.Op. at 1382 n. 9. As the majority recognizes, "[t]he substance of the affidavits was largely incorporated into the factual allegations of the plaintiffs' complaint" and they were exhibits to a preliminary injunction motion. Id. Thus, these are hardly facts outside the record on appeal, see Fed.R.App.P. 10(a), and to the extent they're in dispute, should not be assumed out of existence in affirming summary judgment in favor of the state. The majority, it seems to us, should either accept the disputed facts and hold that they are irrelevant or remand for trial.
 In any event, it is quite clear that defendants have substantially adopted the facts the majority ignores: Plaintiffs relied heavily on matters found in their affidavits in composing their opening brief's statement of facts and included those affidavits in their excerpt of record. Appellant's Brief at 5-8; Appellant's Excerpt of Record, exhs. 3A-3E & 8. Not only did Oregon not object to any of this, but it expressly joined in plaintiffs' statement of facts, describing the facts contained therein as "not disputed." Appellee's Brief at 1. The majority's effort to shut its eyes to facts which the parties have accepted seems to carry procedural sophistry to new heights. If the facts the majority wishes to ignore are all that crucial, wouldn't it be more appropriate to let the district court resolve any factual dispute that may exist?
 
 
 [2]
 See 59 Am.Jur.2d § 14, at 146 ("It is the right and duty of parents under the law of nature as well as the common law and the statutes of many states to protect their children, to care for them in sickness and in health, and to do whatever may be necessary for their care, maintenance, and preservation."). See, e.g., Cal.Civ.Code §§ 196(a), 242 (West Supp.1990); D.C.Code Ann. § 16-916 (1989); Fla.Stat. § 39.11(2) (1988); Ill.Rev.Stat. ch. 23, § 10-2 (Smith-Hurd Supp.1990); Mass.Gen.Laws Ann. Ch. 209, § 37 (West 1987); Mich.Stat.Ann. § 25.244(3), [722.3] (Callaghan 1990); N.J.Stat.Ann. § 9:2-4 (West 1976); N.Y.Dom.Rel.Law § 32 (West 1988 & Supp.1990); Ohio Rev.Code Ann. § 3103.03 (Page 1989)
 
 
 [3]
 The Oregon Administrative Rules provide:
 CSD will protect a child's right to live with his or her immediate or extended family.... In determining either the temporary or permanent placement of a child, CSD will consider placement with relatives in preference to persons the child does not know.
 O.A.R. 412-27-045. O.R.S. 418.937 adopts the same policy with respect to refugee children, giving preference to extended family members over all but natural parents in placement decisions. See also Cal.Welf. & Inst.Code § 361.3(a) ("In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative.").
 
 
 [4]
 The state appears to recognize that foster care placement of disabled children is uncertain. See O.A.R. 412-75-175(2) ("Placement of [a handicapped child such as Sheri] in family foster care is dependent on locating foster parents who have the skill and stamina to care for the child.")
 
 
 [5]
 Before being placed with the Selfs, Billy and Autumn lived in a home where the foster parents were mean to Billy and "would not let [the foster children] out much because they were afraid [the children] would run away." CR 12, Affidavit of William Scalf at 3
 
 
 [6]
 Transcript of Oral Argument, Nov. 15, 1990, at 30-31:
 Court: The question I asked you earlier. If it would cost exactly the same amount of money ... to have these children, this class of children, placed with relatives, [where] the state has said they are better off. What rationality is there in saying, "We'll pay exactly the same amount of money to have you live with strangers," where they are broken up from each other and their relatives?
 Counsel: The rationality may not be in the individual case, but I guess the question would be whether you look at the rationality of the statutory scheme as a whole or in an individual case.
 Court: You have to win on the general proposition ...
 Counsel: I think I do.
 Court: If we test [rationality] by this case, you lose.
 Counsel: I think I do and I think that, well, I shouldn't even say that. You're making....
 Court: That's all right....
 Counsel: It's certainly a lot harder.
 Court: You can be saved by the bell, if you wish time.... [Laughter]
 Counsel: No, it's certainly a harder row to hoe if you look at the individual case, and I guess....
 Court: Can you make any quick arguments for me as to why this makes sense in this individual case or do you give up on that? ...
 Counsel: Your Honor, if I could continue to answer. I think it's the fear of concession, I'd hate to, I can't find much rational about this particular individual case, but I suggest that again the proper focus is on the statute as a whole, not the rationality of this particular individual case and that is, I think, supported by a number of different cases.
 
 
 [7]
 Although the DeFehrs make enough money to support themselves, they are ill-equipped to care for a multi-handicapped child such as Sheri. Mr. DeFehr is often unemployed and made only about $10,000 in 1986. Mrs. DeFehr makes about $800 a month. They have no medical insurance for Sheri and, because of her condition, could not obtain it at any cost. CR 12, Affidavit of Carolyn DeFehr at 2-3
 The Selfs are no better off. Mrs. Self does not work outside the home. While the children lived with the Selfs, Mr. Self was unable to work for medical reasons. During this period, the Self household, consisting of seven souls, had to live on $1200 a month workmen's compensation, plus $258 a month in social security benefits. CR 12, Affidavit of Gloria Self at 2.
 Neither of these cases seems all that unusual. While far from destitute, the DeFehrs and the Selfs have very limited resources. The problem of medical care is particularly vexing, as foster children are not normally included in the definition of family under the terms of medical insurance plans. Based on the scant record before us, it is impossible to tell how many more such cases there are. The state concedes, however, that CSD's policy "has resulted, in some cases, in discouraging families from accepting related foster children," CR 20, Stipulation of Facts at 6, and that there may be cases other than that of the Scalfs where families had to give up their related foster children because they could not afford to keep them. Id. at 6-7.
 
 
 [8]
 This individualized standard is uniformly accepted by states as the touchstone for exercises of their parens patriae power. See R. Mnookin, In the Interest of Children (1985). It is also deeply rooted in our nation's history; to the best of our knowledge the view that the state's parens patriae power over children is limited to actions "which conduce to an infant's welfare" has existed in the United States since at least 1838. Ex Parte Crouse, 4 Whart. 9, 11 (Pa.1838); cf. T. Cooley, A Treatise on the Constitutional Limitations 348 (1868) (Da Capo ed. 1972). In short, this parens patriae limitation reflects a long-standing and still extant tradition that calls for constitutional recognition even under the strictest of views. See Michael H. v. Gerald D., 491 U.S. 110, 127-28 n. 6, 109 S.Ct. 2333, 2344-45 n. 6, 105 L.Ed.2d 91 (1989) (Scalia, J.)
 
 
 [9]
 Many foster children do not understand or do not agree with the decision to remove them from the home of their parents. See R. Hubbell, Foster Care and Families 109-10 (1981)
 
 
 [10]
 Whether the Scalf siblings, Sheri Lipscomb and other children in their situation are in fact better off under the care of strangers or in an institution, rather than with abusive or neglectful parents, is difficult to determine with any degree of objectivity. This is not to suggest that the state ought to leave the children in an abusive home, but it does highlight the need for individualized decisions concerning children's welfare and the suffering that may be imposed on them when decisions are made with other interests in mind. The severe harms that may be imposed upon children as a result of ill-advised foster care placements are too well documented to require belaboring here. See, e.g., R. Hubbell, supra note 7, at 14-15, 43; Oren, DeShaney's Unfinished Business: The Foster Child's Due Process Right to Safety, 69 N.C.L.Rev. 113 (1990); B.H. v. Johnson, 715 F.Supp. 1387 (N.D.Ill.1989)
 
 
 [11]
 As the Supreme Court has recognized in a somewhat analogous context, "[W]hen the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago County, 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989) (citing Youngberg v. Romeo, 457 U.S. at 317, 102 S.Ct. at 2458). Another court of appeals, sitting en banc, has recognized the analogy between foster care and a custodial setting. Taylor v. Ledbetter, 818 F.2d 791, 795-96 (11th Cir.1987) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989)
 
 
 [12]
 When acting to protect children, the state enjoys unusually broad powers. See, e.g., New York v. Ferber, 458 U.S. 747, 757, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982); FCC v. Pacifica Foundation, 438 U.S. 726, 749, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978); Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); see also Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 3167, 111 L.Ed.2d 666 (1990) ("[A] State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court."); Prince v. Massachusetts, 321 U.S. 158, 168, 64 S.Ct. 438, 443, 88 L.Ed. 645 (1944) (upholding a prohibition on use of children to distribute literature on the street: "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens."). The state's heightened power when it acts to protect children is predicated on the fact that it is assuming responsibility for young people who lack the competence to protect themselves. It goes without saying that the state's parens patriae authority is not nearly so broad when it acts to promote interests unrelated to children, or when it acts in derogation of those interests. See note 8 supra
 
 
 [13]
 It is this lack of individualization which causes the entire Oregon scheme to be constitutionally infirm: no provision for waiver; no means for relatives to demonstrate financial need; no moderating exceptions to the categorical rule. Thus, we see no reason to engage in the exercise of dividing and sub-dividing the plaintiffs into various classes and sub-classes. But see Maj.Op. at 1376-77 & 1380 n. 7. The Oregon system, which operates in an unconstitutional manner as to an identifiable number of Oregon citizens encompassed within the district court's class certification, stands or falls as a whole
 
 
 [14]
 [T]he Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones
 Stanley, 405 U.S. at 656, 92 S.Ct. at 1215; see also Santosky, 455 U.S. at 745, 102 S.Ct. at 1390 (requiring clear and convincing proof of neglect before terminating parental rights despite the fact that a preponderance of the evidence standard might be administratively more efficient).