[No. B093350. Second Dist., Div. One. Mar. 6, 1996.]

In re SARAH S., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent, v.
BRENDA S., Defendant and Appellant;
EDMUND S., JR., et al., Interveners and Appellants;
KEN M. et al., Interveners and Respondents.

**COUNSEL**

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

Vincent W. Davis, under appointment by the Court of Appeal, for Interveners and Appellants.

De Witt W. Clinton, County Counsel, Joe Ben Hudgens, Principal Deputy County Counsel, Gary P. Gross, Carrie Clarke, Jones, Day, Reavis & Pogue, Elwood Lui and Laura A. Matz for Plaintiff and Respondent.

Tisha Harmon for Interveners and Respondents.

**OPINION**

**VOGEL (Miriam A.), J.**—We hold in this case that the statutory preference for placement of a dependent child with a relative (Welf. & Inst. Code,

§ 361.3)[1] does not apply to a placement made as part of a permanent plan for adoption. Once the juvenile court determines that reunification efforts have failed, the only statutory preference in the adoption process is for a "relative caretaker or foster parent" as provided in subdivision (k) of section 366.26.

## FACTS

In January 1993, the Department of Children and Family Services took 15-month-old Sarah S. into protective custody. In March, the juvenile court found that Sarah's mother (Brenda S.) and father (John B.) were unable to care for Sarah,[2] declared Sarah to be a dependent of the court and, in May, placed Sarah with her maternal grandfather, Edmund S., Sr., and Edmund's wife, Darlene S.[3] In July, Edmund and Darlene obtained DCFS's permission to have Lorey K. provide "baby-sitting" services for Sarah. As will appear, it was not until much later that DCFS and the juvenile court discovered that, from the outset, Sarah's grandparents ignored the juvenile court's orders and delegated responsibility for virtually all of Sarah's care to Lorey and, later, to Ken and Pat M. This case is about Ken and Pat's efforts to adopt Sarah, and similar efforts by one of Sarah's maternal uncles (Edmund S., Jr., referred to as "Ed" to avoid confusion with his father)[4] and Ed's wife, Kathy.

As soon as Ed and Kathy learned that Sarah had been taken into custody by DCFS, they contacted a DCFS social worker to ask whether Sarah could live with them in Arizona. They were told it was not possible at that time because the juvenile court would attempt to reunify Sarah with Brenda. Ed and Kathy persisted, and had "dozens" of conversations with the various social workers assigned seriatim to Sarah's case during 1993 and 1994. During this same period, Ed and Kathy also had two or three dozen conversations with Edmund and Darlene about Sarah and where she would live. Throughout this time, Edmund and Darlene told Ed and Kathy that Sarah was living with them (that is, with Edmund and Darlene), and Ed and Kathy had no idea that Sarah was spending much of her time with Lorey or with Ken and Pat. Ed and Kathy made it clear to DCFS and to Edmund that they wanted to adopt Sarah. Edmund, however, had his own agenda—he wanted to keep Sarah in California.

In January 1994, Edmund arranged to have Sarah spend most of her time (days and nights) with Ken and Pat (for all practical purposes, she was living

[1]Unless otherwise stated, all section references are to the Welfare and Institutions Code.

[2]Brenda (who has a history of drug abuse) was and is unable to care for Sarah, and John was and is unwilling to do so.

[3]Edmund is divorced from his first wife, Sarah's grandmother, who is not involved in these proceedings. For convenience, we refer to Edmund and Darlene as Sarah's grandparents.

[4]In other words, Ed and Brenda are brother and sister and are both Edmund's children. Ed is the oldest of four children (in addition to Ed and Brenda, there are two other brothers).

with them). Edmund did not tell DCFS or the juvenile court about this arrangement and, to make matters worse, Edmund flat-out lied to Ken and Pat, telling them that "nobody" wanted to adopt Sarah and that Ed and Kathy's only interest was in long-term foster care "or something along that line" so they could be financially compensated. That clearly was not the case (and there is *nothing* in the record to suggest that Ed and Kathy are in this for the money). To the contrary, it is clear that all they wanted was to provide a stable home for Sarah, no more and no less.

In March 1994, DCFS reported to the juvenile court that Brenda had been in jail, that she had not been in regular contact with Sarah, and that Brenda had not completed parenting classes or drug counseling as previously ordered by the court.[5] The report states that "[t]he grandparents are unable to provide a permanent home" for Sarah "because of their age and health," but that Ed and Kathy had "expressed a strong desire to adopt" Sarah, as had Ken and Pat, who are described as "distant relatives . . . closely connected to the grandparents and [Sarah]." By that time, it was clear that Ken and Pat had "developed a warm bond" with Sarah.[6] DCFS recommended that Sarah remain with her grandparents, that permanent placement services be ordered, and that adoptive home studies be initiated for both couples (Ed and Kathy, and Ken and Pat).

On May 27, a permanency planning hearing was held. DCFS reported that Brenda had been found but that she was once again out of contact, and a recommendation was made that Sarah be referred for adoptive planning with Ed and Kathy. As DCFS saw it at that time, although (1) the grandparents favored adoption by Ken and Pat "because it [would] allow them to remain closely connected" with Sarah, and although (2) a psychological evaluation indicated that a placement in which the grandparents remained actively involved "would be beneficial in reducing the trauma of separation," and although (3) "[b]oth potential adoptive families appear[ed] to be suitable based on available information and both [had] expressed a strong desire to adopt," Ed and Kathy nevertheless "should be given priority consideration"

---

[5]Brenda had found time, however, to give birth to another child (in July 1993). Although no details were provided, Brenda told one of the social workers that she had voluntarily relinquished the baby for adoption and that fact was confirmed by the social workers. At the time of the March 1994 report, Brenda's whereabouts were unknown.

[6]The record suggests that, although the social worker knew Ken and Pat had been spending time with Sarah, the social worker did not then know Sarah was living with them. And although Ed and Kathy suggest that Ken and Pat concealed the living arrangements from DCFS, the record does not support that inference. Ken thought Pat had discussed it with the social worker, and Pat simply assumed that Sarah's grandparents, the persons ultimately responsible for Sarah under the court's orders, had the court's permission to do what they were doing. If blame must be placed, it belongs on Edmund's shoulders, not on either of the two couples who want to adopt Sarah.

because they are relatives and Ken and Pat are not "legal relatives."[7] At the conclusion of the hearing, family reunification services were terminated and permanent placement services were ordered.

During the fall of 1994, DCFS changed its recommendation. In a report prepared for a September hearing, DCFS described Sarah (then approaching age three) as a well-adjusted, thriving child who had obviously bonded to Ken and Pat (by then, she was referring to them as "mommy" and "daddy"). Because they live in Arizona, Ed and Kathy had visited Sarah only a few times (although they remained eager to adopt her and make her a part of their family). Thus, DCFS concluded that Sarah's best interests would be met if she could be adopted by Ken and Pat, and DCFS has, at all times since September 1994, maintained this view.

At a series of hearings commenced on September 23, the court was finally made aware of Edmund's subterfuge. At the hearing held on that date, attorneys appeared for Ed and Kathy, and for Ken and Pat, and (by stipulation) both couples were ultimately granted standing to participate in the proceedings. An attorney was appointed to represent Sarah. Sarah's other maternal uncles (that is, Brenda's and Ed's brothers) were present in court and it soon became clear that there was an ongoing tension between Edmund, his daughter, and his sons, including Ed. On October 4, with the agreement of all parties, the court appointed Daniel Kramon, Ph.D., to conduct a psychological evaluation of Sarah and of both couples to "determine issues of bonding, attachment, and the best interests of the child in terms of an adoptive home." In the interim, the court issued orders strictly limiting Sarah's contact with Ken and Pat. At an October 11 hearing, the court addressed the issue of visitation by both couples. After listening to a series of ad hominem attacks by the lawyers representing the two couples, each of whom told a different story about the nature and extent of Sarah's contact with Ken and Pat, Edmund and Darlene, and Lorey (who was still providing some day care for Sarah),[8] the court, clearly outraged, made the following comments and orders:

"All right. I've read today's report and I don't know what's going on. I would indicate for the record the reports and the stories are suggesting what

[7]Although the record is far from clear, it seems Ken and Pat *may be* related to Edmund by reason of his marriage to Darlene, which means they are not related to Sarah. Other evidence suggests they are not related at all, but met Sarah through Lorey, who later introduced Pat and Ken to Edmund and Darlene. It really doesn't matter since, even assuming section 361.3 applied, the only relatives entitled to "preference" are adult grandparents, aunts, uncles and siblings—and there is no suggestion that Ken or Pat fit that definition. (§ 361.3, subd. (c)(2).)

[8]By this time, Ed and Kathy were upset because it was apparent that the existing arrangement would increase the bond between Sarah and Ken and Pat, and that it would become increasingly more difficult to take her away from them. Ken and Pat, the only "parents" Sarah has ever known, were distressed because Sarah became upset when she could not be with them and, of course, they were worried about losing Sarah to Ed and Kathy. In

[the grandparents] are doing is running around the court's order and directly violating the intent of this court . . . by pursuing their own special interest. I'm going to order [a] supplemental report . . . . I am not going to include the grandparents in the [psychological evaluation] and I'm terminating all future contact between [Ken and Pat] and the child until next week, the child is to spend every night at the grandparents' home . . . . [¶] I suspect that the grandparents are not the primary caretaker of the child, and are taking care of her only on the surface and have delegated that to the friends that want to adopt a child, and they're circumventing the intent of this court. I want [a] visit [with Ed and Kathy] to occur next Saturday, and next week I will evaluate the report and consider replacement of the minor."

When Sarah's lawyer explained that Darlene was in the hospital but due to be released in a day or two and that Edmund would need help in caring for Sarah, the court said Edmund would have to find someone other than Ken, Pat and Lorey to provide assistance: "If he can't do it, we will replace the child. He undertook that responsibility. He understands the conflicting interest in the child. He understands the hostility and the estrangement between the family members and I've got responsibilities of doing what's in the best interest for the child, and first of all, I don't see any detriment by terminating contact for at least a week for [Ken and Pat] and [Lorey] and the child. I will review it next week. Between now and then I want that child staying at the grandfather's house. He can make whatever other arrangements he wants to . . . care for the child. That's the order."

On October 18, the court issued visitation orders which generally had Sarah spending alternate weekends with the two couples who wanted to adopt her. The court permitted Sarah to remain with her grandparents but directed Edmund to either care for her himself or hire a neutral party for assistance. On November 30, Dr. Kramon submitted his psychological evaluation but, at a hearing held that day, the court discovered that Dr. Kramon had not been told that the grandparents were not to participate in the evaluation and that, as a result, Dr. Kramon had called them to discuss Sarah. To avoid the possibility that the evaluation was tainted by Edmund's input, the court appointed Dr. Hershel Swinger to perform another psychological evaluation.

Dr. Swinger interviewed Ken and Pat, Ed and Kathy, and Sarah, and on January 11, 1995, submitted a detailed report to the court which concluded as follows: "Sarah . . . is fortunate to have two sets of competent, healthy parents willing to adopt her. Sarah appears to view [Ken and Pat] as her

---

short, Edmund succeeded in making both couples miserable and in endangering his granddaughter's emotional health.

family and there is a serious conflict between [Brenda, Edmund and Ed]. Because of the conflicts[,] it is likely that Sarah would not receive the psychological benefits one would expect from a relative placement. Therefore, at this time, it is in Sarah's best interest to be placed in the home of [Ken and Pat]."[9]

During May 1995, extensive hearings were held to determine Sarah's permanent placement. The two couples testified, as did Edmund, Brenda, Kevin S. (an uncle), Laura S. (an aunt), Lorey, and two of the social workers who had handled Sarah's case. After listening to the testimony, reviewing the reports and recommendations submitted by Dr. Swinger and by DCFS, the court decided that Sarah's best interests would be served by a placement for adoption with Ken and Pat. Brenda, Ed and Kathy have appealed.

---

[9]Dr. Swinger's report supports his conclusions. It is clear that both couples were capable of providing proper care for Sarah (both own comfortable homes in nice areas and both appear to have solid marriages), but it is equally clear that a warmer, more accepting atmosphere exists with Ken and Pat. Ken is described as someone with "good ego strength," who is "willing to work cooperatively with and listen to others," "a healthy, well-adjusted outgoing husband and father who has a very warm, affectionate and playful relationship" with Sarah. Pat is described as someone who "likes people," and as "an emotionally stable, well adjusted wife and mother [she has a son from a former marriage] who has demonstrated her stability by overcoming significant traumas and functioning [in] an appropriate manner. She verbalized love for Sarah, and Sarah was comfortable and affectionate in their interactions." On the other hand, although Kathy is also described as "emotionally stable," Dr. Swinger's opinion is that she is "very traditional and conservative in her ideas about 'right and wrong' and family values" (she has two daughters of her own). And then there is Ed, who "feels betrayed by his father. He states that his father's actions favoring the other family in the adoption of Sarah are because Ed was the first person to move away from the nuclear family." Ed is described by such phrases as "cool," "reserved," "formal," and "aloof." As Dr. Swinger put it, "[t]he problems in his primary family seemed to have caused Ed to develop a defensive approach towards life. . . . [¶] [Ed] is a likeable friendly man who has had some serious relationship problems with his father and adopted sister. His parents did not provide stable parent models and this conflict could have negative consequences for Sarah in relationship to the importance of being adopted into a relatives' household." Significantly, Dr. Swinger had the opportunity to observe Sarah with both couples. He concluded that she "was much more animated, outgoing and verbal while in the company of [Ken and Pat] than she was while in the company of [Ed and Kathy]."

Dr. Swinger's report concludes thus: "There is serious conflict between [Ed] and his adopted sister, the mother of Sarah and Sarah's maternal grandfather, who is the present caretaker of Sarah. This conflict places Sarah in the middle and it could impede her psychological development. [Ken and Pat] indicate that they would like to have a continuous relationship with Sarah even if she is placed with [Ed and Kathy] but [Ed] feels that Sarah won't be able to relate to his family of origin because of their conflicts. [¶] Therefore, at this time, [Ken's and Pat's] household appears to be the best psycho-social environment for the growth and development of Sarah . . . ."

## DISCUSSION

### I.

 Ed, Kathy and Brenda contend the juvenile court abused its discretion by placing Sarah for adoption with Ken and Pat instead of with Ed and Kathy who, according to Brenda, Ed, and Kathy, are entitled to preference because they are Sarah's "relatives." We disagree.[10]

### A.

Section 361.3 provides a "preference" for relatives when a child is removed from the custody of a parent and placed outside the home:

"(a) In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative. In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of the following factors:

"(1) *The best interests of the child, including special physical, psychological, or emotional needs.*

"(2) The wishes of the parent.

"(3) The provisions of . . . the Family Code regarding relative placement.

"(4) Placement of siblings and half-siblings in the same home, if such a placement is found to be in the best interest of each of the children.

"(5) The good moral character of the relative.

"(6) The ability of the relative to do the following:

"(A) Provide a secure and stable environment for the child.

"(B) Exercise proper and effective care and control of the child.

---

[10]DCFS contends Brenda lacks standing to raise this objection because she does not seek restoration of her parental rights and thus is not a party "aggrieved" by the orders she attacks. (See *In re George B.* (1991) 228 Cal.App.3d 1088, 1094 [279 Cal.Rptr. 388] [only a party aggrieved by an order may appeal from that order].) Since the same issue has been raised by Ed and Kathy, whose standing is not questioned by DCFS or anyone else, we do not decide the issue but simply assume Brenda's standing and reject the argument on the merits.

"(C) Provide a home and the necessities of life for the child.

"(D) Protect the child from his or her parents.

"(E) *Facilitate court-ordered reunification efforts with the parents.*

"(F) *Facilitate visitation with the child's other relatives.*

"In this regard, the Legislature declares that a physical disability, such as blindness or deafness, is no bar to the raising of children, and a county social worker's determination as to the ability of a disabled relative to exercise care and control should center upon whether the relative's disability prevents him or her from exercising care and control. The county social worker shall ask the parents if there are any relatives that should be considered for placement. This inquiry shall not be construed, however, to guarantee that the minor will be placed with any person so identified. The county social worker shall further investigate the existence of other relatives for possible placement and document these efforts in the social study prepared pursuant to Section 358.1. However, *this investigation shall not be construed as good cause for continuance of the dispositional hearing* conducted pursuant to Section 358.

"(b) In any case in which more than one appropriate relative requests preferential consideration pursuant to this section, each relative shall be considered under the factors enumerated in subdivision (a).

"(c) For purposes of this section:

"(1) *'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated.*

"(2) 'Relative' means an adult who is a grandparent, aunt, uncle, or sibling.

"(d) Subsequent to the [dispositional] hearing conducted pursuant to Section 358, whenever a new placement of the minor must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the minor's reunification or permanent plan requirements. In addition to the factors described in subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the minor.

"(e) *If the court does not place the child with a relative who has been considered for placement pursuant to this section, the court shall state for the record the reasons placement with that relative was denied.*" (Italics added.)

## B.

Ed, Kathy and Brenda contend section 361.3 applies to all placements, including those for adoption. That is not how we read the statute.[11]

First, there is the plain language of section 361.3. In defining the guidelines governing the decision whether a child should be placed with a particular relative, section 361.3 repeatedly refers to "placement" without mention of adoption or any sort of permanent placement (the only exception being when "new placements" become necessary). (§ 361.3, subd. (d).) It requires consideration of the parents' wishes (§ 361.3, subd. (a)(2)), of the caretaker's ability to protect the child from his or her parents (§ 361.3, subd. (a)(6)(D)), and of the ability of the relative to facilitate court-ordered reunification efforts (§ 361.3, subd. (a)(6)(E)), factors that are wholly or largely irrelevant once parental rights are terminated. By its own terms, therefore, section 361.3 applies when "a child is removed from the physical custody of his or her parents" and thus must be "placed" in a temporary home, not when reunification efforts have failed and a permanent plan for adoption has been approved (or when a child has otherwise been freed for adoption).

Second, section 361.3 does not exist in a vacuum. Subdivision (k) of section 366.26 provides that, "[n]otwithstanding any other provision of law, the application of any person who, as a *relative caretaker* or foster parent, has cared for a dependent child *for whom the court has approved a permanent plan for adoption, or who has been freed for adoption*, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being. [¶] As used in this subdivision, *'preference' means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child.*" (Italics added.)

---

[11]Although this issue was raised in *In re Stephanie M.* (1994) 7 Cal.4th 295, 319-320 [27 Cal.Rptr.2d 595, 867 P.2d 706], the Supreme Court did not reach it. There, the question was phrased as whether the statutory preference for placement with relatives applied after the juvenile court had terminated reunification services. (*Ibid.*) As the high court explained, however, the question was academic because the statute had been amended significantly after the hearing there under review. (*Id.* at p. 320.) Accordingly, the Court simply assumed the preference did apply and concluded the question before the juvenile court was, at bottom, to determine whether the particular placement was in the child's best interests. (*Id.* at p. 321.)

By its plain language, subdivision (k) of section 366.26 overrides section 361.3 when it comes to placements for *adoption.* Thus, under section 361.3, a "relative" is given priority over others regarding the order in which applications for *placement* are processed. (§ 361.3, subd. (c) [defining "preferential consideration" as granting the relative seeking placement the right to "be the first placement to be considered and investigated"].) Under section 366.26, subdivision (k), a "relative caretaker" is given priority over others regarding the order in which applications for *adoption* are processed. (§ 366.26, subd. (k) [defining "preference" to afford the relative caretaker or foster parent the right to have his or her application processed before all other applications for "adoptive placement"].) Stated otherwise, section 361.3 assures interested relatives that, when a child is taken from her parents and placed outside the home pending the determination whether reunification is possible, the relative's application will be considered before a stranger's application. (See also Fam. Code, § 7950, subd. (a) [priorities for "foster care placement" are granted to relatives, provided the placement will "facilitate visitation and family reunification"].) When reunification fails, section 366.26, subdivision (k), assures a "relative caretaker" who has cared for the child that, when parental rights are terminated and the child is freed for adoption, his or her application will be considered before those submitted by other relatives and strangers. When (as here) the relative caretaker (Edmund) does not seek to adopt the child, there is no statutory preference for any relative.

This is not a novel concept. ■ As the statutory scheme demonstrates, the focus at the beginning is on the parents' relationship with the child and, when possible, on reunification. (§§ 361.5 [except in limited circumstances, when a child is removed from the parents' custody, the parent is entitled to 12 months of reunification services, with a possibility of 6 additional months], 366 [the juvenile court must review the case at least once every 6 months], 361.3, subd. (a)(6)(E); *In re Marilyn H.* (1993) 5 Cal.4th 295, 308 [19 Cal.Rptr.2d 544, 851 P.2d 826] [at every review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody].) But when reunification services have been terminated, the parents' interests in the care, custody and companionship of the child are no longer paramount, and "the focus shifts to the needs of the child for permanency and stability." (*Id.* at p. 309.)

■ For these reasons, we conclude the preference afforded by section 361.3 applies to placements made before the juvenile court has terminated reunification services. When reunification has failed, however, and the juvenile court has before it a proposed permanent plan for adoption, the only

relative with a preference is a "relative caretaker" (if there is one seeking to adopt) and the only preference is that defined by subdivision (k) of section 366.26 (that is, a preference to be first in line in the application process). (See *In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 320-321 [even where the preference of section 361.3 applies, it does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests].) It follows that Ed and Kathy, who were not Sarah's caretakers, are not entitled to any statutory priority.

## II.

■ The only remaining question, therefore, is whether the trial court somehow abused its discretion by placing Sarah with Ken and Pat for adoption. Quite clearly, it did not.[12]

First, we summarily reject the suggestion that Ken and Pat are not "morally fit" because they did not come into court with "clean hands." The record is clear that the only person with unclean hands was Edmund, and that Ken and Pat did nothing wrong. As the juvenile court put it, Edmund "deceived and betrayed the trust of his own family." He also deceived DCFS and the court. As a result, the juvenile court rejected his testimony because it was next to impossible to determine what portion of it, if any, had been truthful. Conversely, there "was no evidence presented . . . to prove that [Ken and Pat] knew that Ed . . . was willing to adopt Sarah. In this regard, [Ken and Pat] were deceived by [Edmund] and his wife. As regards to Sarah, and to the extent that it is even legally relevant, [Ken and Pat] have not come into court with unclean hands." Since the evidence clearly supports these findings by the trial court, no more need be said.

Second, the juvenile court carefully considered Sarah's best interests and, based upon the evidence summarized at the beginning of this opinion, determined that Sarah should be adopted by Ken and Pat. In a detailed "memorandum opinion," the juvenile court specifically found that Sarah should be adopted by Ken and Pat for several compelling reasons. For one thing, Sarah is emotionally attached to Ken and Pat and "[t]hat attachment is strong, recent, and healthy. It would be detrimental to sever that attachment now by placement with Ed . . . and his family in Phoenix, especially in light

---

[12]The trial court found that, assuming a preference for placement with Ed and Kathy, Sarah's best interests required placement with Ken and Pat. We agree, but our discussion assumes there is no preference.

of Sarah's prior history of multiple placements." For another, Ken and Pat "are committed to permanently providing for Sarah's physical and emotional needs. They have amply demonstrated their ability to do so, and she has thrived in their care."

The court also found there "is a greater likelihood that Sarah will maintain familial relationships she has developed to date if placed with [Ken and Pat]. She will have the benefit of maintaining relationships with the[ir] relatives and friends . . . . These are very positive and beneficial to Sarah [and p]lacement of Sarah with Ed . . . in Phoenix would make maintenance of these relationships difficult . . . . [¶] If [Ken and Pat] allow Sarah, and they should, to continue her relationships with Ed . . . and his family, and all of her relatives by birth, this would give Sarah the best of both worlds. This would require [Ken and Pat] to be sensitive and empathetic to the . . . family's feelings of anger, betrayal and loss, and it would require the . . . family to move beyond the negative feelings they may have towards Edmund . . . and his wife. Emotionally, if not legally, Ed . . . and Kathy can still be Sarah's aunt and uncle and their children can still be Sarah's cousins. . . .

"There is no doubt that the decision of this Court will cause Ed . . . and all of [his family] much pain, anger, and ill will towards [Edmund] and his wife. There is no doubt that Ed . . . believes, and rightfully so, that had he been able to come forward for custody in February or March, 1994, at or about the time Sarah was illegally placed by [Edmund] with [Ken and Pat], [Ed] would have received preferential consideration for placement, and this trial would not have been necessary. Clearly he was prevented from doing so by the deceitful actions of his father. [¶] In the desire to prevent [Edmund] from benefiting from his wrongful acts, the Court must not lose sight of the fact that its focus must still be on the best interests of Sarah. . . . [I]t would be grossly unfair and unjust to Sarah to have her bear the detrimental consequences of replacement at this time with Ed . . . in Phoenix just to punish [Edmund] for his wrongful acts. She is innocent of all that has happened and she deserves only what is in her best interests irrespective of the conduct of others."[13]

By any rational analysis, the trial court did not abuse its discretion.

---

[13]We summarily reject the contention that Ed and Kathy have a constitutional right, as relatives, to adopt Sarah. Although there are constitutional protections for the preservation of family relationships (*Lipscomb by and through DeFehr* v. *Simmons* (9th Cir. 1992) 962 F.2d 1374, 1378), the relationship between a child and a non-parent family member must give way to the best interests of the child when adoption becomes necessary. (*In re Stephanie M., supra,* 7 Cal.4th at p. 321 [placement with a non-relative affirmed because it was in the child's best interests].)

## DISPOSITION

The orders are affirmed.

Spencer, P. J., and Masterson, J., concurred.

A petition for a rehearing was denied March 26, 1996, and the petition of all appellants for review by the Supreme Court was denied June 26, 1996.